Clifford RAY and Louise Ray, individually, and as the parents and guardians of their minor children, Richard, Robert and Randy Ray, Plaintiffs,

v.

The SCHOOL DISTRICT OF DESOTO COUNTY, and Lawrence D. Browning, Marilyn P. Mizell, James Westberry, Rodney Hollingsworth, T.A. Strickland, Phyllis Nesmith, Ronnie Allen, James Abraham, and Donald E. Knoche, in their official capacities, Defendants.

No. 87–88–CIV–FtM–17(C).

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 5, 1987.

Judith S. Kavanaugh, Sarasota, Fla., for plaintiffs.

Harry A. Blair, Fort Myers, Fla., for defendants.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

KOVACHEVICH, District Judge.

This cause is before the Court on motion for preliminary injunction. The twelve count complaint was filed in this case on June 16, 1987. The complaint alleged the following: 1) misclassification under the Rehabilitation Act of 1973, 2) wrongful segregation under the Rehabilitation Act of 1973, 3) deprivation of procedural due process under the United States Constitution, 4) deprivation of substantive due process under the United States Constitution, 5) equal protection under the United States Constitution, 6) deprivation of rights because of physical handicap under Florida

Constitution, 7) violation of right to education under Florida Constitution, 8) denial of equal protection under Florida Constitution, 9) denial of due process of law under Florida Constitution, 10) violation of Florida Educational Equity Act, and 11) and 12) abuse of the powers and duties of school districts.

On June 17, 1987, Plaintiffs filed a motion for temporary restraining order and motion to dispense with imposition of security bond for preliminary injunction. Upon due consideration, the motion to dispense with imposition of bond is hereby GRANTED.

A hearing was held June 19, 1987, on the motion for temporary restraining order. At that time, this Court reserved ruling on the motion and ordered a second hearing for the purpose of presentation of the best available, up-to-date medical evidence. At that hearing, the parties agreed to attempt to agree to arrangements for segregated schooling of the Ray children for the summer school session.

On June 24, 1987, the Court entered an interim order memorializing the segregated schooling arrangements for the children. (Docket No. 14). A jurisdictional issue was raised at the hearing as to the current county of residence of the Ray family. The Court finds sufficient evidence in the record, at this time, to establish Plaintiffs reside in DeSoto County, Florida. Accordingly, the motion to dismiss for lack of jurisdiction is hereby DENIED.

A second hearing was held on July 10, 1987, at which time the parties presented the requested medical testimony. The Court orally denied Plaintiffs' motion in limine to exclude the testimony and strike the affidavits of Dr. Robertson. (Docket No. 48). The Court allowed the parties until July 17, 1987, in which to file any further affidavits, depositions, or supporting documentation. The Court ordered that certain medical tests be conducted on all six (6) members of the Ray family. The results of that testing and any further pleadings were to be filed with the Court by July 24, 1987.

On July 24, 1987, the American Medical Association (AMA) filed a motion to file an amicus curiae brief in the cause. That motion was granted by this Court on July 27, 1987. The brief was filed that date.

In addition to the motion for preliminary injunction the following motions have been filed in this case and remain outstanding:

1. 7–2–87–Plaintiffs' motion to strike affidavit of Dr. Crankshaw (Docket No. 17).

2. 7–2–87–Plaintiffs' motion to vacate, dissolve, or modify order and grant preliminary injunction (Docket No. 18).

3. 7–9–87–Defendants' motion to enlarge time (Docket No. 25).

4. 7–9–87–Plaintiffs' motion for judicial notice (Docket No. 47).

5. 7–17–87–Plaintiffs' motion in opposition to filing of or to exclude or limit deposition testimony of Dr. Arroyo (Docket No. 63).

6. 7–17–87–Plaintiffs' renewed motion to exclude or limit testimony of Dr. Armentrout (Docket No. 64).

7. 7–17–87–Plaintiffs' motion to strike affidavits filed by Defendants (Docket No. 68).

8. 7–23–87–Plaintiffs' motion to strike affidavits filed by Defendants (Docket No. 74).

9. 7–24–87–Defendants' opposition to second affidavits of Dr. Good and Dr. Barbosa, which the Court interprets as a motion to strike or disregard affidavits (Docket No. 79).

Any motion not specifically addressed and ruled upon in this order is hereby DENIED.

In determining whether or not a preliminary injunction is appropriate, this Court must address the following issues: 1) the likelihood that the moving party will ultimately prevail on the merits of the claim, 2) the irreparable nature of the threatened injury, 3) the potential harm that might be caused to the opposing parties or others if the order is issued, and 4) the public interest, if any. Rule 4.06(b)(1), Rules of the

District Court of the United States for the Middle District of Florida.

## JURISDICTION AND VENUE

1. This action arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 20 U.S.C. §§ 1401–1405, and the Constitution of the United States. The Court is vested with jurisdiction under 28 U.S.C. § 1331 and § 1343(3).

2. Venue lies in this Court, Fort Myers Division, pursuant to 28 U.S.C. § 1391(b) and Rule 1.02, Rules of the United States District Court Middle District of Florida.

## PARTIES

1. Clifford and Louise Ray are citizens and residents of DeSoto County, Florida, and are the natural parents and guardians of Richard, 10 years old; Robert, 9 years old; and Randy, 8 years old. The Rays have a fourth child, Candy, who is their youngest and not a party in this case.

2. Defendant School District of DeSoto County (District) is a public entity organized under the laws of the State of Florida and is the governing body of the public school system in DeSoto County, Florida. The District is a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794.

3. Defendants James Westberry, Rodney Hollingsworth, T.A. Strickland, Phyllis Nesmith, and Ronnie Allen, in their official capacities, are elected members of the DeSoto County School Board (Board), responsible for ensuring compliance with applicable federal and state law.

4. Defendant Lawrence D. Browning, in his official capacity, is the elected Superintendent of the District, charged with statutory responsibility, pursuant to §§ 230.-32–.33, Fla.Stat., with administration and management, supervision of instruction, and policy development of the District.

5. Defendant Marilyn P. Mizell, in her official capacity, is Director of the Exceptional Student Educational Program for the District, overseeing special education provided to students classified as exceptional students, pursuant to Public Law 94–142.

6. Defendant James Abraham, in his official capacity, is the principal of West Elementary School in the District, where Richard and Robert Ray were enrolled in August, 1986.

7. Defendant Donald E. Knoche, in his official capacity, is the principal of Memorial Elementary School in the District, where Randy Ray was enrolled in August, 1986.

Based on the evidence adduced at the two hearings in this case, the supporting documentation, and the memoranda and briefs filed by both parties, in short the entire voluminous record in this case at this stage of litigation, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### FACTUAL BACKGROUND OF THE RAY CHILDREN

1. Richard, Robert, and Randy Ray are all hemophiliacs of moderate severity. Hemophilia is a blood clotting disorder. There are approximately 20,000 hemophiliacs in the United States. Approximately half of those are classified as severe. Because of their being hemophiliacs, all three boys do now, and have in the past, required injections of blood products, know as Factor VIII. Factor VIII is used to promote coagulation and clotting of blood.

2. Prior to 1985, Factor VIII was not treated nor screened for the Acquired Immune Deficiency Syndrome (AIDS) virus. (Testimony of Dr. Barbosa). Since 1985, Factor VIII has been subject to heat treatment procedures to eliminate the potential to transmit AIDS. [*Hemophilia Information Exchange*, April 1986, Plaintiffs' appendix III–A to motion for temporary restraining order (TRO)].

3. At this time, approximately ninety-five percent (95%) of all severe hemophiliacs test positive (seropositive) for the human immuno-deficiency virus (HIV or HTLV–III or LAV). (Testimony of Dr. Barbosa).

4. In August of 1986, Randy Ray was hospitalized at All Children's Hospital in St. Petersburg, Florida, for removal of intestinal (rectal) polyps. During the course of routine blood work, it was discovered that Randy tested positive for the HIV virus. The treating physician recommended that the entire family be tested. Both Robert and Richard were also seropositive; however, Mr. and Mrs. Ray and the daughter Candy tested negative for the HIV virus.

5. It is the best medical judgment of the treating physician, Dr. Barbosa, that the Ray boys came into contact with the HIV virus through the injection of the Factor VIII clotting agent. It is his opinion that the exposure occurred prior to 1985 when the present screening and heat treating methods began being employed. (Affidavit and Testimony of Dr. Barbosa).

6. On August 27, 1986, all four Ray children were enrolled in the DeSoto County school system for the 1986–87 school year. The Rays decided to voluntarily disclose the fact that the boys had tested seropositive. They informed Defendant Abraham at West Elementary and Defendant Knoche at Memorial Elementary. At that time, all four Ray children were removed from the classroom and work was prepared and sent home for the children.

7. Candy Ray was allowed to return to the classroom at some time after August 27, 1986, but prior to the beginning of homebound instruction for the boys. On or about October 1, 1986, the three Ray boys began receiving homebound instruction. The Court does not find it necessary or appropriate to these issues to decide whether or not the Rays voluntarily placed the boys in the home bound program or whether they were "duped" by the Board or other Board employees in placement of the boys on homebound instruction.

8. Subsequent to the exclusion of the boys from the classroom, the District received input from the Florida Department of Health and Rehabilitative Services (HRS) on recommended guidelines for excluding them from the classroom. Additionally, Drs. Barbosa, the treating physician at All Children's Hospital; Gross, Chief of Pediatric Hematology at the University of Florida Medical School; and S.P. Clement, Pediatric Consultant for Children's Medical Services-HRS, advised the Board that their medical opinions were that the Ray boys should be returned to an integrated classroom. (Plaintiffs' appendix I in support of TRO).

9. The boys were taught at home through November and December, 1986. Clifford Ray left his employment in January, 1987, to stay home and help care for the boys. In February, the Rays decided to leave DeSoto County and moved to Bay Minette, Alabama. All four children were enrolled in school in Alabama. Subsequent to starting school, the Rays for various reasons disclosed the boys' conditions to that school system. The Bay Minette school system removed the boys from the classroom.

10. Thereafter, the Rays returned to DeSoto County, Florida. On April 27, 1987, the Rays attempted to enroll all four children in school; they had with them health department certificates certifying the boys able to attend school.

11. The Rays were informed the boys were enrolled indefinitely in the homebound program. On June 12, 1987, Defendant Browning informed Plaintiffs that the Board's position had not changed and that "The School Board will not admit Randy, Robert, and Richard to the regular classroom setting, including regular Summer School."

12. The Board has offered to the Ray boys either homebound instruction or "separate but equal full-time, isolated instruction." This Court, by its order of June 24, 1987, approved the second option, separate but equal, as an interim arrangement pending the resolution of the motion for preliminary injunction. The Ray boys attended a segregated classroom for the summer session. The fall session of the District starts August 24, 1987. The Board continues to deny Richard, Robert, and Randy Ray admission to an integrated classroom.

## ACQUIRED IMMUNITY DEFICIENCY SYNDROME

AIDS is a viral disease involving the breakdown of the body's immune system.

A "full-blown" case of AIDS is believed by the medical community to be "incurable and almost inevitably fatal." (U.S. Department of Justice Memo for General Counsel, June 20, 1986). As stated by Surgeon General C. Everett Koop, M.D., Sc.D., in an interview on July 31, 1987, this is the "real thing".

In this Court's memory and personal experience are examples of quarantine procedures utilized in an era that was more concerned with effect on the public than with individual rights. This Court well remembers the polio outbreak forty to forty-five years ago, with the stark vision of the "iron lung", which struck terror in the hearts of parents and children. Survival of the masses required the closure of public facilities, i.e. swimming pools and parks. If a conflagration is raging, there is no way to reason with it. If a fire is out of control it is indiscriminate in its destructiveness; whatever is in its path is subject to the onslaught. Often it is necessary to start backfires, and sacrifice property that might not have otherwise been consumed, for the purpose of extinguishing the raging inferno.

While we wait for medical science to save us from what many think may be such a raging, indiscriminate inferno, it is the task of this Court to deal with the here and now of this lethal, inevitably fatal disease, for which there is currently no innoculation and no cure. The mystery of the virus and its communicability challenges jurists legally to be assured our decisions do not lead us to allow proliferation of this disease by our ignorance.

The Court must take medical science as it *now* finds it; this decision may *not* be based on speculation of what the state of medical science *may be* in the future, no matter how close that future may be. No party "wins" in this; when we consider alternatives, what is the alternative to life?

Many people have expressed opinions in this case, most quite passionately, both in favor of and opposed to the return of these children to an integrated classroom. However, it becomes *solely* the duty of this Court to assimilate all of the opinion evidence, expert testimony, and factual allegations, in order to make a decision which is in accord with the law and in the *best* interests of the public in general, and the DeSoto County School District and Richard, Robert, and Randy Ray specifically.

13. The first cases of the disease now known as AIDS were reported to the Public Health Service's Centers for Disease Control (CDC) in 1981. The CDC is the central repository for AIDS reporting and research in the United States. As of December, 1986, 28,098 patients (including 394 children under 13) meeting the CDC's case definition for AIDS, had been reported. (Brief of the AMA).

14. Current medical researchers have concluded that AIDS is caused by infection with human immuno-deficiency virus (HIV). The HIV is a human retrovirus, distinguished from other viruses by chromosome structure and mode of replication, which penetrates chromosomes of certain human cells that combat infection throughout the body.

15. When the virus enters the body it begins to attack certain white blood cells (T-lymphocytes), which are an integral part of the human immune system. Specifically, the disease destroys, and generates qualitative abnormalities, in the victim's T-helper/inducer cells, which enable other components of the immune system to function. The virus thereby weakens the victim's immune system.

16. The earliest indications of HIV infection are: 1) detection of antibodies to the virus in the blood or 2) the actual isolation of HIV in the blood. The appearance of antibodies is known as seroconversion and can be detected before there is any noticeable immunological damage.

17. Presently it is not known with any certainty what percentage of those individuals testing seropositive, as the Ray boys in this case have, will ultimately develop clinical AIDS. The U.S. Public Health Service has estimated that twenty to thirty percent (30%) of the seropositive population may develop AIDS by 1991. However, other medical experts postulate that the number of "healthy carriers" who eventually

develop AIDS may be as much as ninety (90%) percent of the seropositive population. (*Readers Digest*, "AIDS: The Plague That Knows No Boundaries," June 1987).

18. According to the most recent research, hemophiliacs who test positive for AIDS antibodies have been less likely to develop AIDS than have other AIDS virus or HIV infected groups. (Second Affidavit of Dr. Good). Less than one percent (1%) of the estimated population of 20,000 persons with hemophilia in the United States have contracted AIDS. (*Hemophilia Information Exchange*, April 1986).

19. An individual is not considered to have AIDS by testing seropositive. Indeed a person can test seropositive and display a number of symptoms characteristic of the disease and not be considered to have AIDS. Rather, an essential element of the definition of AIDS used for reporting purposes by the CDC is affliction with one or more of the opportunistic diseases which take advantage of the suppressed immune system. (U.S. Department of Justice Memo for General Counsel).

20. The CDC's narrow definition of AIDS has led to the creation of an informal classification known as AIDS-related complex (ARC). ARC generally applies to persons in high-risk groups "who manifest a constellation of signs and symptoms that are suggestive of the syndrome but do not manifest the secondary complication of the disease." (U.S. Department of Justice Memo for General Counsel).

21. The general medical opinion at this time is that it is unlikely that an effective vaccine will be ready for at least five years; that is a vaccine, not a cure. (*Readers Digest*, "AIDS: The Plague That Knows No Boundaries", June 1987). Dr. Good testified at the July 10, 1987, hearing that even if a vaccine were to have been discovered that date, it would be three to five years before it would be in widespread use.

22. Finding a vaccine is difficult because HIV is "...extremely complex. It also undergoes 'antigenic drift'—surface changes that confound the body's immune system ... 'If the drifts turn out to be significant, the search for a vaccine will become more difficult.'" (*Readers Digest*, "AIDS: The Plague That Knows No Boundaries", June 1987).

23. The attention in this case is directed to the possibility and/or probability of communicability of the AIDS virus by the Ray boys to the school district population. This Court is unaware of any researcher who claims to completely understand the transmission of AIDS or the HIV antibodies. The following is a summary of what has been represented to this Court as being the current state of medical science's understanding.

24. The risk groups, and their percentage of the AIDS population, now identified by the medical community are: 1) homosexuals or bisexual men (73%), 2) hemophiliacs (1%), 3) transfusion recipients (2%), 4) intravenous (IV) drug users (17%), 5) sexual partners of risk-group members (1%), and 6) infants born to infected mothers (1%). Approximately five percent (5%) of the AIDS population does not fall into any of these groups, but researchers believe they came in contact with the virus in similar ways. (*AIDS: The Facts*, American Red Cross, May 1986).

25. HTLV–III/LAV has been isolated in a wide range of body fluids, including blood, semen, saliva, tears, breast milk, and urine. The risks of communications are known to have occurred in the following ways: 1) intimate sexual contact with an infected person; this is the most frequent method of transmission, 2) invasive exposure to contaminated blood or blood products, i.e., IV drug use, blood transfusion, or 3) perinatal exposure, from infected mother to infant. The Surgeon General of the United States, C. Everett Koop, M.D., Sc.D., in a July 31, 1987, interview recommended that we regard the presence of the HIV in body fluids other than blood, semen, and breast milk, as if it were not there.

26. Extensive and numerous studies have consistently found no apparent risk of HIV infection by individuals exposed through close, non-sexual contact with AIDS patients. These studies have demonstrated that contacts involving sharing of

household items, such as toothbrushs, eating utensils, and baths or toilets, do not lead to HIV-infection. Similarly, there is no evidence that close personal, but non-sexual interaction, such as giving a bath, shaking hands or kissing on the lips, will cause HIV-infection. (Brief of AMA; Report of Surgeon General; *AIDS: The Facts*, American Red Cross).

27. Two studies concerning transmission have particular relevance here because of their focus on a hemophiliac population. The first report is a three-year study of hemophiliac and non-hemophiliac children attending a boarding school in France. The students, average age 10 years, lived full-time in the school and shared all the school and dormitory facilities, including classrooms, swimming pools, dining halls, lavatories and sleeping areas. At the end of the three years, half of the hemophiliac children were seropositive. However, *none* of the non-hemophiliac children had seroconverted. (*The Lancet*, "Transmissibility of Human Immunodeficiency Virus in Haemophilic and Non-Haemophilic Children Living in a Private School in France", September 13, 1986).

28. A second study measured the HIV antibody status in individuals who assisted hemophiliacs with home infusions and blood clotting factor. Despite approximately forty-four person years of exposure through close casual contact and assistance with injections, *none* of the household members became infected. (Brief of AMA, citing Lawrence, "HTLV–III/LAV Antibody Status of Spouses and Household Contacts Assisting in Home Infusion of Hemophilia Patients", 66 *Blood* 703, 704–05 (1985).

29. According to recent research, *Seroconversion to Human Immunodeficiency Virus (HIV) in Hemophiliacs: Relation to Lymphadenopathy*, Tulane University, February, 1986, "although seropositivity and lymphadenopathy have been found in many of our patients, few have developed clinical disease we can relate to HIV infections." Only thirty-five percent (35%) of HIV positive hemophiliacs in the study were found, on direct culture analysis, to carry live AIDS virus in their blood. (Second affidavit of Dr. Good).

30. The CDC, the American Academy of Pediatrics, and other medical groups have developed recommended guidelines concerning school attendance for children infected with the HIV antibody. (*AIDS: Recommendations and Guidelines*, Center for Disease Control, November 1982–November 1986; *Report of the Committee on Infectious Diseases*, American Academy of Pediatrics, 1986; *AIDS and Children*, American Red Cross, October 1986; and *Surgeon General Workshop on Children with HIV Infection and Their Families*, April 6 through 8, 1987). The following constitute the recommendations of the American Academy of Pediatrics:

a. Most school-aged children and adolescents infected with HTIV–III should be allowed to attend school without restrictions and with the approval of the child's physician. Based on present data the benefits of unrestricted school attendance of these children outweigh the possibility that they will transmit the infection in the school environment.

b. Some infected students may pose an increased risk to others in school. Students who lack control of their body secretions, who display behavior such as biting, or who have open skin sores which *cannot* be covered require a more restricted school environment until more is known about the transmission of the virus in these circumstances. Arrangements for special education should be made for children who are unable to attend regular classes. (Emphasis supplied).

c. School districts should identify individuals, including the child's physician, who have the qualifications to evaluate whether or not an infected child poses a risk to others. Assessment of the need for educational alternatives to regular school should be performed regularly. Hygienic practices of an infected student may improve with maturation or deteriorate if the condition worsens. If a risk is determined to exist, the child should be removed from the classroom and an appropriate alternative education program

established until a subsequent review determines that the risk has abated. At the time a decision is made to exclude a child from school, a plan for periodic review should be established.

d. The number of personnel aware of the child's condition should be kept to the minimum needed to assure proper care of the child and to identify situations where the potential for transmission may be increased. Persons involved in the care and education of an infected student must respect the student's right to privacy. Confidential records should be maintained.

e. All schools should adopt routine procedures for handling blood or body fluids, including the disposal of sanitary napkins, regardless of whether or not students with HTLV–III infection are known to be in attendance. School health care workers, teachers, administrators, and other employees should be educated about procedures which have been established by local codes. For example, soiled surfaces should be promptly cleaned with disinfectants, such as household bleach, diluted 1 part bleach to 10 parts water. Persons involved in cleaning contaminated surfaces should avoid exposure to open skin lesions or mucous membranes to blood or body fluids.

f. Children infected with HTLV–III may develop immunodeficiency, which increases their risks of experiencing severe complications from infections such as chickenpox, tuberculosis, measles, cytomegalovirus and herpes simplex virus. Those known to be infected should be excused from regulations which mandate live vaccines as a condition for school attendance. The child's physician regularly should assess the risk of an unrestricted environment on the health of the HTLV–III–infected student.

g. Routine screening of children for HTLV–III infection is not recommended. The Pediatric Redbook also recommends that adolescents should be educated about risk factors for AIDS and HTLV–III infection, including sexual transmission, injecting drugs, and sharing needles or syringes.

Those who are sexually active should be made aware of the risk of sexual exposure to persons known or suspected to have AIDS or HTLV–III infection. In addition, sexual contact with multiple partners, or with those who have multiple partners, increases the risk of infection. If adolescents are sexually active, they also should be counseled about the regular use of condoms reducing the risk of infection.

31. The recommendations promulgated by other medical groups are consistent with those quoted above. The CDC additionally recommends the following:

a. Decisions regarding the type of educational and care setting for HTLV–III/LAV-infected children should be based on the behavior, neurologic development, and physical condition of the child and the expected type of interaction with others in that setting. These decisions are best made using the team approach including the child's physician, public health personnel, the child's parent or guardian, and personnel associated with the proposed care or educational setting. In each case, risks and benefits to both the infected child and to others in the setting should be weighed.

b. All educational and public health departments, regardless of whether HTLV–III/LAV-infected children are involved, are strongly encouraged to inform parents, children, and educators regarding HTLV–III/LAV and its transmission. Such education would greatly assist efforts to provide the best care and education for infected children while minimizing the risk of the transmission to others.

32. The CDC has expressed no intention of changing its recommendation as to the schooling of HIV-positive children. (Testimony of Dr. Good; letter of CDC, July 1, 1987, appendix B in support of preliminary injunction).

**MEDICAL HISTORY OF RICHARD, ROBERT, AND RANDY RAY**

33. As previously stated, the Ray boys have been since birth hemophiliacs of moderate severity. The boys each tested HIV

positive in August 1986; the best medical opinion is that the HIV was contracted from injection of Factor VIII which promotes coagulation or clotting of the blood. It is unknown exactly when the boys became seropositive, but again the best medical evidence available to the Court opines the exposure to the HIV antibody occurred prior to 1985. (Testimony of Dr. Barbosa).

34. All three Ray boys have been immunized pursuant to the requirements for attending school in the State of Florida. (Docket No. 67).

35. All three Ray boys have in the past tested positive for hepatitis B. The most current testing on the boys show that the hepatitis infection is resolved in Robert and Randy Ray. The testing of Richard on January 30, 1987, indicates he suffers from chronic hepatitis B.

36. Defendants have submitted to the Court numerous medical records, reports, and affidavits which relate instances when medical treatment was required for bleeding incidents for each of the boys. Defendants' affidavits relate incidents of bleeding occurring in the school or day care setting. The Court will not recite those incidents. Defendants proposed findings of fact contains a complete recitation of those incidents, which recitation is incorporated by reference herein.

37. The majority of the incidents recited by Defendants occurred prior to the discovery that the Ray boys were seropositive and prior to their being instructed as to the CDC guidelines as to care and precaution to take in order to protect others. Dr. Barbosa testified that he was the first person to instruct the Rays in the CDC guidelines after the seropositive testing of August, 1986. The Court does not consider these incidents significant to its decision here. It is the conduct and condition of the boys subsequent to their testing HIV positive and being instructed in proper precautions that is of import to the instant motion for preliminary injunction.

38. The incidents reported after the seropositive testing reveal the following matters that might be considered problematic within the educational (homebound) setting.

On January 14, 1987, Robert's mouth was bleeding secondary to a cracked tooth. The homebound teacher stated that when he spoke Robert sprayed blood in his books. On October 8, 13, 27, and 30, 1986, the homebound instructor indicated that Randy's mouth was bleeding. There is no evidence that these "bleeds" were so uncontrolled as to endanger others in the educational setting. These types of problems are better handled by temporary removal from the integrated classroom, if necessary, than by total exclusion from that environment.

39. This file contains no medical testimony or opinion that any of the Ray boys are manifesting any symptoms of AIDS. Dr. Barbosa has stated that, to date, all the boys have immune functions within normal ranges. (Affidavit of Dr. Barbosa, page 4). Any suggestion to the contrary is not supported by competent medical testimony or opinion.

40. The following persons or organizations have recommended to the Board that the Ray boys be allowed to attend school in an integrated classroom setting: 1) Dr. Barbosa, treating physician; 2) Dr. Clement, DeSoto County Health Department; 3) Dr. Good, Chairman Department of Pediatrics University of South Florida; 4) Dr. Gross, Chairman of Pediatric Hematology at the University of Florida Medical School, and 5) Dr. Clement, Pediatric Consultant for Children's Medical Services-HRS.

41. Legal counsel for the District advised Defendant Westberry, on May 22, 1987, that "there are no reported cases in our favor. In all the reported cases we were able to find, the court ruled in favor of the students and directed that they be placed in a regular classroom setting." (Docket No. 2, Exhibit A).

42. Defendants presented testimony of Dr. Armentrout, who recommended the use of "goggles, gloves, and gowns" whenever dealing with HIV positive persons. Dr. Armentrout had never examined the Ray children, but had given cursory examination to their medical records.

43. Also testifying for Defendants was Dr. Robertson, who is an epidemiologist, not a medical doctor. Dr. Robertson advocated quarantine of the Ray boys. Again, Dr. Robertson's testimony was not based on personal observation of the Ray boys, but on their medical records and his opinion as to the "best" treatment of AIDS and HIV positive victims.

44. On June 8 and 9, 1987, Karen M. Loucks, M.S., Developmental/Behavioral Specialist at the Department of Psychology of All Children's Hospital, St. Petersburg, Florida, conducted educational psychological evaluations on Richard, Robert, and Randy Ray. The following represent her preliminary conclusions:

a. Each of these children is suffering significant emotional distress (KML) in part as a result of their continued exclusion from the normal classroom setting. The emotional symptoms include anxiety, feelings of rejection, anger, resentment, and fear of social rejection. These problems are manifested in various ways including bed wetting, where such episodes had not occurred before; crying episodes, nightmares and sleep disorders, and physical complaints such as stomach aches.

b. Each of these boys suffer varying degrees of educational deficiencies ranging from moderate to severe, which are attributable at least in part to their exclusion for the past school year from the regular comprehensive program of education. In order to maintain average skills and to achieve their full potential, all of these children will require the full benefits of the regular educational program plus special education programs available in the public classroom environment such as reading programs, and possibly KML special programs for the learning disabled.

c. I observed behavior or emotional problems in these children which can be attributed in part to their continued exclusion from interaction with their peers and from the normal academic program.

d. It is my strong recommendation that these children be restored as soon as possible to the regular classroom program. If a summer school program is available, I strongly recommend their immediate enrollment. Each day these children continue to be excluded from the interaction of their peers and the comprehensive course of instruction afforded by normal classroom education in the public school system, will further exacerbate their emotional problems and weaken their ability to achieve acceptable academic progress.

45. The Court ordered certain medical tests conducted on all six members of the Ray family. The results of the tests were filed with the Court on July 24, 1987, although apparently the results were ready earlier, since the news media first reported those results on or about July 20, 1987. The members of the Ray family have lived together on a daily basis, both prior to and subsequent to the seropositive testing of the boys. The July, 1987, testing revealed that the three boys, Richard, Robert and Randy, tested HIV positive, whereas Mr. and Mrs. Ray and Candy again tested HIV negative. (Docket No. 76).

## CONCLUSIONS OF LAW

■ The Court would remind everyone at this point that this cause of action is before the Court on a motion for preliminary injunction. As stated previously, this Court must address the following issues: 1) the likelihood that the moving party will ultimately prevail on the merits of the claim, 2) the irreparable nature of the threatened injury, 3) the potential harm that might be caused to the opposing parties or others if the order is issued, and 4) the public interest, if any. Since an injunction is an extraordinary and drastic remedy, it will not be granted unless the movant clearly carries the burden of persuasion as to all four prerequisites. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983).

### Irreparable Injury

The Ray boys have been and are being denied access, by the Board, to an integrated classroom and all the social and edu-

cational benefits which flow from placement in that "normal" classroom environment. The question is whether this denial constitutes irreparable injury for these boys, in this particular factual situation.

■ Irreparable injury is distinquished from mere injury, which can be adequately compensated through the award of money. *United States,* 720 F.2d 1511 at 1520. It is the opinion testimony of Karen Loucks that the deprivation being caused to the Ray boys, by excluding them unnecesarily from a normal, integrated classroom setting, constitutes irreparable injury to their mental well-being and educational potential.

■ This Court agrees and finds Plaintiffs have established irreparable injury arising from the continued denial of access to a classroom setting for the Ray boys. Neither a monetary award or prevailing on the merits, can or will compensate Richard, Robert, and Randy for what this Court views to be continuing irreparable harm, as long as these boys are denied access to an integrated classroom.

The reality is that the Ray boys have already been dealt a hand not to be envied by anyone. The boys at their young ages are having to face two potentially life-threatening diseases. This is more than most people face in their entire adult lives. Denial of the opportunity to lead as normal an educational and social life as possible is adding insult to injury. *Unless and until* it can be established that these boys pose a real and valid threat to the school population of DeSoto County, they shall be admitted to the normal and regular classroom settings, to which they are respectively educationally entitled.

**Public Interest and Potential Harm to Others**

■ The public at large has several interests to be considered here. First, is the concern of the public to provide adequate, non-discriminatory education to all the children of this state. The children of this state include children like the Ray boys, who, through no fault of their own, have contracted this disease; it clearly provokes in many, fear and a desperate desire to segregate them from mainstream life. However, there is an equally important public interest in protecting the health and safety of the public at large, and here, specifically, the school population which would be in contact with the Ray boys, if they are returned to an integrated classroom.

It is the duty of this Court to weigh all factors in this case and balance the competing interests, in order to determine if a preliminary injunction is appropriate. The Court finds that the actual, ongoing injury to Plaintiffs in this case clearly outweighs the potential harm to others, and that the public interest in this case weighs in favor of returning these children to an integrated classroom setting.

Defendants assert future theoretical harm that may occur to Defendants and/or to the school population of DeSoto County, including transmission of the disease in the classroom setting and liability of the Board for allowing the Ray boys in the classroom. Such theoretical harm as to transmission is *not* supported by the evidence in this case. The clear weight of the expert medical evidence and opinion is in favor of returning these children to the integrated classroom, as long as the guidelines are followed and proper care is maintained.

The Court recognizes the concern and fear which is flowing from this small community, particularly from the parents of school age children in DeSoto County. However, the Court *may not* be guided by such community fear, parental pressure, and the possibility of lawsuits. "These obstacles, real as they may be, cannot be allowed to vitiate the rights ..." of Richard, Robert, and Randy Ray. *New York State Association for Retarded Children, Inc. v. Carey,* 466 F.Supp. 479, 485 (E.D.N.Y.1978), *aff'd,* 612 F.2d 644 (2d Cir.1979). Plaintiffs have established to the satisfaction of this Court that the interests of Plaintiffs in returning Richard, Robert, and Randy Ray to the classroom clearly outweigh the competing interests of the public in general, and Defendants in particular, as this case is *currently* postured.

## Likelihood of Prevailing on the Merits

The final prerequisite that Plaintiffs must establish, in order for a preliminary injunction to be granted, is the likelihood of Plaintiffs prevailing on the merits in this case. The likelihood of success issue requires the Court to address the proper standard to be applied and application of that standard to the facts of this case. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 334 (5th Cir. 1981).

■ The Court, upon examination of the record and such scant legal precedent as is available, finds Plaintiffs have carried their burden, at this stage of litigation, of establishing the likelihood that they will prevail on the merits of this case. *Accord, School Board of Nassau County, Florida v. Arline,* —— U.S. ——, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Thomas v. Atascadero Unified School District,* 662 F.Supp. 376 (C.D.Calif.1986); *District 27 Community School v. Board of Education,* 130 Misc.2d 398, 502 N.Y.S.2d 325 (1986).

Defendants have been unable to present to this Court any legal precedent in support of its position that the Ray boys should be denied access to a public classroom education. The Court notes that defense counsel informed Defendants prior to the onset of this litigation that "... In all the reported cases we were able to find, the court ruled in favor of the students and directed that they be placed in a regular classroom setting." (Docket No. 2, Exhibit A).

■ The legal precedents and medical testimony presented in this case leaves no doubt in this Court's mind that the motion for preliminary injunction should be GRANTED. The Court cautions both parties, but in particular Plaintiffs, that the imposition of the preliminary injunction places certain important, indispensable responsibilities on the parties. This order is certainly not an end, but an intermediate step, in the lives of the Ray family, especially Richard, Robert, and Randy. No matter how unfair the hand that has been dealt these boys may appear, it is factually their situation at this time. These boys are going to be required to be *responsible,* in their conduct, attitude, and demeanor, beyond the level of responsibility generally expected of boys their ages. The Court recognizes the burden that the boys will bear; however, the Court has no option except to place this responsibility most heavily upon the Ray family and specifically Robert, Richard, and Randy. The following are preliminary conclusions of law made for the purpose of this motion for preliminary injunction, and based on the record at this stage of litigation:

1. The Defendant DeSoto County School District is a recipient of federal funds within the meaning of 29 U.S.C. § 794, § 504 of the Federal Rehabilitation Act.

2. Plaintiffs are domiciled in DeSoto County and Defendants are obligated to provide them with a free public education. § 230.232(1), Fla.Stat.

3. Based on the foregoing, Plaintiffs are likely to succeed on the merits of the case. Richard, Robert, and Randy Ray have suffered irreparable injury because of their exclusion from the integrated classrooms of DeSoto County, Florida. The balance of hardships and public interest is in favor of Plaintiffs. Plaintiffs are entitled to the issuance of a preliminary injunction prohibiting the DeSoto County School Board from denying them access to integrated classrooms in DeSoto County, Florida, within the relevant guidelines promulgated by this order.

4. The attendance of Richard, Robert, and Randy Ray in the integrated classrooms of DeSoto County, Florida, will be governed by the published guidelines for such attendance, from the Center for Disease Control and the American Academy of Pediatrics (Pediatric Redbook) as discussed earlier in this order.

5. The Court suggests that the parties form a committee consisting of, at least, the Rays' treating physician, public health personnel, the parents of the boys, and personnel in the school system who are associated with the educational setting for Richard, Robert, and Randy Ray. (See, *AIDS: Recommendations and Guide-*

*lines*, CDC, November 1982–November 1986). The mission of this committee would be to assist in making decisions, on a continuing basis, as to whether or not, within the applicable guidelines, the Ray boys should, for any given amount of time or transitory phase, be in the integrated classroom. The Court cautions both parties that, if there are continuing problems with the parties agreeing on the attendance of the boys in the classroom, this Court will appoint an independent mediator. That mediator will serve at the behest of the Court and the Court will determine the proper party to advance money to compensate the mediator at the time that it is forced to make such appointment.

6. The Ray family, and in particular Richard, Robert, and Randy, are charged with the responsibility of being informed of the applicable guidelines relevant to their attendance in an integrated classroom and of *stringently* complying with those guidelines. In particular, Plaintiffs must insure that all sores and lesions be covered and remain covered during school sessions. The Plaintiffs must be responsible for having an elevated standard of hygiene for Richard, Robert, and Randy. Whatever their chronological years these three boys must take on adult *responsibility*, for protecting themselves from substantial risk at school, and, the school population from risk of exposure to the HIV virus, and the possible consequences which might occur from such exposure.

7. The Ray boys are probably already aware that they must avoid contact sports in the school environment. (Testimony of Dr. Barbosa). The Court must additionally charge them to avoid all incidents at school, which would tend to result in blood spills or the exchange of other body fluids known to result in the transmission of the AIDS virus. The Court must require, despite the age of these boys, that they be provided with complete, clear sexual education as it pertains to the transmission of this disease through sexual contact. Indeed, the Court desires that the same type of information be provided to the entire school system of DeSoto County.

8. The Court will require that the School Board of DeSoto County provide educational program(s) to the school parent population of the county, with the aim of educating and informing them regarding the realities of AIDS and HIV positive victims, and, the proper procedures in order to deal with the situation and to minimize the risk of transmission to others. In additon, a copy of this Order is to be made available to the public at the school office that each of the Ray boys attend.

9. If, under the applicable guidelines, one or more of the Ray boys must be removed from the integrated classroom on a temporary basis, the following standards should be applied to provide alternative education during the temporary removal:

a. If the removal from the classroom is five school days or less, the School Board will provide to the respective child work assignments to be completed at home, in order that the child or children may not fall behind his classmates.

b. If the removal from the classroom is for five school days to thirty school days, the School Board will provide to the respective child homebound education for the duration of that removal, in order that the child may not fall behind his classmates.

c. If the removal from the classroom is for in excess of thirty school days, the School Board will provide to the respective child, if the child's condition so allows, segregated schooling, such as that previously provided by order of this Court on June 24, 1987.

10. Whenever Richard, Randy, or Robert Ray are seen by a physician or health care provider, Plaintiffs must submit to this Court a report from that health care provider as to the nature of that visit and any information resulting therefrom.

11. The Court requires that Richard, Robert, and Randy Ray be retested for the AIDS virus and progress of their seropositivity six months from the date of their last test, as ordered by this Court and completed July 15, 1987, and every six months

thereafter, unless modified or amended by this Court.

■ 12. The Court requires that Clifford, Louise, and Candy Ray be retested for the HIV virus or AIDS one year from the date of their last test, as ordered by this Court and completed July 15, 1987, and every year thereafter, unless modified or amended by this Court.

Accordingly, it is

ORDERED that Plaintiffs motion for preliminary injunction be GRANTED. Until further order Defendants, School District of DeSoto County, the DeSoto County School Board, Superintendent Lawrence Browning, Marilyn P. Mizell, James Westberry, Rodney Hollingsworth, T.A. Strickland, Phyllis Nesmith, Ronnie Allen, James Abraham, and Donald Knoche, their successors, employees, and agents are hereby enjoined and restrained from:

1. Excluding Richard, Robert, and Randy Ray from an integrated classroom enrollment, attendance, and related activities and all educational services and opportunities (except contact sports) offered to other students of the DeSoto County School system, within the parameters established by this Order.

2. Otherwise discriminating against or denying educational opportunity to Richard, Robert, and Randy Ray, within the parameters established by this Order.

IT IS FURTHER ORDERED that Plaintiffs Clifford, Louise, Richard, Robert, and Randy Ray shall comply with the order of this Court in so far as sending the boys to school and operating within the parameters established by this Order. As previously stated, the motion to waive the posting of a bond is granted.