[No. B035656. Second Dist., Div. Four. Dec. 20, 1989.]

PAUL GLEN JASPERSON, Plaintiff and Appellant, v. JESSICA'S NAIL CLINIC et al., Defendants and Respondents.

1100

1102

COUNSEL

Allred, Maroko, Goldberg & Ribakoff, Gloria Allred, Nathan Goldberg and Carla D. Barboza for Plaintiff and Appellant.

Robert M. Myers, City Attorney (Santa Monica), Joseph Lawrence, Assistant City Attorney, Martin T. Tachiki and Jeffrey W. Holtzman, Deputy City Attorneys, Steven Rosenblit, Michael Colmenares, James K. Hahn, City Attorney (Los Angeles), Charles I. Goldenberg, Assistant City Attorney, David I. Schulman, Deputy City Attorney, Jon W. Davidson and Paul L. Hoffman as Amici Curiae on behalf of Plaintiff and Appellant.

Geragos & Geragos and Paul J. Geragos for Defendants and Respondents.

## OPINION

**WOODS (A. M.), P. J.—** ■ ■■■ ■ ■ Paul Glen Jasperson (appellant) appeals the judgment in his action against Jessica's Nail Clinic and Jessica Vartoughian (the clinic, Vartoughian or, collectively, respondents) by which he sought to enjoin them from refusing him a pedicure because he suffered from acquired immune deficiency syndrome (AIDS).[1] At stake is the validity of the West Hollywood city ordinance prohibiting discrimination against persons with AIDS.

On July 21, 1986, appellant was discharged from a hospital where he had been treated for pneumocystis carinii pneumonia, an opportunistic disease associated with AIDS.

On July 23, 1986, appellant went to Jessica's Nail Clinic for a pedicure. He was given an appointment for the following day. While at the clinic, appellant, a hairdresser, ran into a client whom he told about his condition. His remarks were overheard by two employees of the clinic. The next day, appellant was called by the clinic and told his appointment had been cancelled. Appellant attempted to reschedule his appointment but was told by an employee that the clinic was "not taking any new male clients." Appellant subsequently called respondent Vartoughian who repeated this explanation of why appellant was not given an appointment. She denied appellant's accusation that the true reason he was refused an appointment was because he had AIDS.

Vartoughian's version of the telephone conversation was that appellant was upset because he had been told that the clinic's pedicurist was "double-booked" and he would be unable to get an appointment for four or five weeks. He then expressed his belief that he had been denied an appointment because he had AIDS. She said that she apologized to him, and asked whether he could wait for an appointment, but also told him that she could not force "the girls" at the clinic to give him a pedicure. She testified that

---

[1] Appellant is dead, having succumbed to complications from AIDS. Respondents moved to dismiss this appeal as moot but the motion was denied, citing *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 189 [209 Cal.Rptr. 220].

"If an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise an inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot. [Citations.]" (*Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213].) The question of the validity of AIDS antidiscrimination ordinances is a classic instance of a matter of continuing public controversy likely to recur as more jurisdictions adopt such ordinances. Additionally, the high rate of mortality among people with AIDS coupled with the sometimes glacial pace at which litigation moves through the courts makes it appropriate for the court to review the merits of the case before us to determine the validity of the ordinance.

the people at the salon were upset by appellant's revelation that he had AIDS and were unwilling to give appellant a pedicure.

Appellant filed a complaint alleging three causes of action. The only cause of action that went to trial was based on violation of a West Hollywood city ordinance prohibiting discrimination against people with AIDS. The ordinance prohibits discrimination in "employment, housing, business establishments, health care services, city facilities and services, and other public services and public services and accommodations."[2] Respondents answered, raising the defense of "justification" in claiming that their conduct did not violate the statute because to have provided services to appellant would have exposed the workers at the clinic to "a deadly risk to their health."

Trial was by court. The evidence adduced at trial pertained to the risk of transmission of the AIDS virus during a pedicure.

Appellant put on three expert witnesses experienced in AIDS research and education.

Dr. Neal Schram is a board certified practitioner of internal medicine and nephrology associated with Kaiser Hospital. Dr. Schram sits on three Kaiser Permanente AIDS committees, and is a past chairman of the Los Angeles City/County AIDS Task Force. Among his other activities in the field of AIDS education, Dr. Schram assisted in the development of nationwide AIDS guidelines in the workplace by the Center for Disease Control.

Dr. Shirley Fannin is a board certified pediatrician with a subspecialty in infectious disease, trained in epidemiology. At the time of trial she was employed by the Los Angeles County Department of Health Services as an associate deputy director in charge of disease control programs. Her position required her to take measures to protect county residents from being infected with communicable diseases.

---

[2] The West Hollywood ordinance, numbered section 4270 et seq., defines business establishment as "any entity, however organized, which furnishes goods or services to the general public." Section 4274 makes it "an unlawful business practice for any person to deny any individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodation of any business establishment . . . on the basis (in whole or in part) that such person has the medical condition AIDS or AIDS-related condition." Exempted from this section are any "service facility or establishment engaged in the exchange of products containing elements of blood or sperm" as, for instance, blood banks and sperm banks. The ordinance is enforceable through a civil action and injunctive relief.

A number of other cities and counties in California have enacted similar antidiscrimination ordinances including the cities of Santa Monica and Los Angeles which filed amicus curiae briefs on appellant's behalf.

Dr. David Ho is a research scientist associated with Cedars-Sinai Medical Center in Los Angeles, and an assistant professor in medicine at UCLA Medical School. He is board certified in internal medicine. Dr. Ho has been involved in AIDS research since 1982, focusing on the potential development of a vaccine and defining the mechanism by which the virus alters the central nervous system. He has published extensively on various aspects of the AIDS virus in such journals as the New England Journal of Medicine and the Yale Journal of Biological Medicine.

These physicians testified that the AIDS virus is transmitted in only one of three ways: exposure to contaminated blood, sexual contact or perinatal exposure, that is an infected mother to a newborn child. In the case of blood-to-blood transmission, for infection to occur, there must be a direct access between the blood of the infected person and the blood of an uninfected person through an open or "weeping" lesion or sore.

Evidence was introduced that 99.999 percent of the blood cells of an infected person do not carry the virus, rendering it statistically unlikely that a single drop of blood would infect. In a study involving 735 individuals who were stuck with needles known to be contaminated with infected blood, only three people tested positive for the presence of the antibody that the body forms once it is infected with the HIV virus.

Sandra Gullart, a supervising teacher at a cosmetology school, testified that a pedicure involves the following process: First, the client's feet are placed in an antiseptic solution for three to five minutes. By state law, the cosmetologist may not perform a pedicure if the client's feet have open cuts or sores or abrasions of any kind. After the antiseptic bath, any nail polish is removed from the client's feet. Next, the toenails are clipped and the edges filed smooth. The nails are buffed with an emery board or metal file after which the feet are placed in a hot bath. The feet are removed from the bath one at a time and a cuticle solvent is applied by a cotton swab. Finally, cuticle is pushed back using a rubber tipped pusher. The instruments which are used to give a pedicure are an orange wood stick which has the dual function of pushing back the cuticle or applying polish remover, a plastic rubber tipped pusher also used to push back cuticles, toenail clippers, an emery board or metal file for buffing the nails, a brush for brushing loose cuticles and toe separators used when nail polish is applied. Other than the toenail clippers and the metal file, state law prohibits the use of metal instruments in giving a pedicure.[3]

---

[3] The trial court judicially noticed Business and Professions Code section 7352 which states: "When providing a manicure or pedicure a cosmetologist or manicurist shall use no

There was conflicting evidence as to whether blood is likely to be shed in the course of a pedicure. Ms. Gullart testified that in giving or observing 10,000 pedicures she had only seen bleeding once. Respondent Vartoughian and one of her students characterized accidents during pedicures which result in bleeding as "occasional" or "common" occurrences.

All of these witnesses agreed, however, on various sterilization procedures which, if followed, would inactivate the HIV virus. All instruments are required by law to be sterilized in a 70 percent alcohol solution at the beginning of each day and between customers. Additionally, if blood is drawn during a pedicure the same strength solution is used to disinfect both the cut and the contaminated instrument. Finally, all blood is wiped clean from a contaminated instrument using a 70 percent alcohol solution before the instrument is again used. It was uncontroverted that a 70 percent alcohol solution will completely inactivate the HIV virus within a minute. The virus could also be inactivated by use of .3 percent hydrogen peroxide, household bleach, or other disinfectants.

Dr. Donald O'Conner, a family practitioner, testified as respondents' medical expert. Dr. O'Conner completed his internship in family medicine in 1984 and was hired by the Community Clinic in Vacaville, California as its director. Dr. O'Conner is essentially a sole practitioner, as the other physician employed by the clinic, an obstetrician, is called in only as needed. Dr. O'Conner had no specialized training in infectious diseases and had done no clinical research on AIDS.[4]

It was Dr. O'Conner's opinion that medical associations, AIDS organizations, the United States Public Health Department and the Attorney General of the United States are lying to the public about AIDS. He believed that reported studies have been falsified and there are unexplained cases of AIDS which support his opinion that, in fact, AIDS can be transmitted through all body fluids and by normal household contact; that the virus can

---

metal instruments except those metal instruments necessary for the cutting, trimming, manicuring or pedicuring of nails or cuticles."

Dr. Schram testified that the Centers for Disease Control have developed guidelines for personal service workers which involve such things as not working with open or exudative wounds on one's hands. Additionally, as previously noted, extant state law proscribes working on feet with open cuts, sores, or abrasions, and bars the use of metal instruments in performing a pedicure minimizing the possibility of a cut resulting in bleeding, and provides for sterilization procedures described above which would inactivate the virus.

Respondent Vartoughian testified that pedicurists use another metal instrument, called a toenail nipper, for hangnails. She testified she was not aware of any statutory prohibition on the use of such an instrument.

[4] Dr. O'Conner had never testified in an AIDS case before this appearance and became involved in this case when he read about it in the newspaper and called respondents' counsel and offered his services.

be airborne by coughing, sneezing, etc.; and that it can be transmitted by touching or shaking hands. Dr. O'Connor also disputed the testimony of the other physicians as to what constituted adequate protection against AIDS. He testified that AIDS patients should be quarantined.

On cross-examination Dr. O'Conner conceded that his opinions about AIDS differ substantially from mainstream opinion on the subject. The doctor acknowledged that he had never heard of a case in which a person contracted AIDS from a pedicure procedure.

Following the presentation of testimony, the court took the matter under submission and subsequently denied the injunction in a written statement of decision.

Although the court was critical of the scope of the ordinance, it did not find the ordinance invalid because it was overbroad. Indeed, the court did not hold the ordinance invalid on *any* ground. Instead, the trial court posited the issue as "whether a reasonable basis exists not to enforce the ordinance under certain conditions."

After weighing the conflicting evidence the trial court concluded that the only method of transmission of the AIDS virus "relevant in the context of this case [is] direct transfer from a person infected with the AIDS virus to the blood of another person." The court characterized the risk of the transmission of AIDS during a manicure as "marginal." The court concluded, however, that any "risk of death, however minimal, cannot be acceptable or tolerated."

Judgment was entered for respondent. This appeal ensued. We reverse.

## I

In its written statement of decision the trial court found that employees of respondent Vartoughian refused service to plaintiff based on their knowledge that he had been infected with the AIDS virus and that Vartoughian knew this to be the reason for the refusal.

The court further found that the city ordinance was legally enacted in the proper exercise of "legislative authority." The court observed that "as a general rule, judicial deference to a legislative enactment is a constitutional imperative, and the court should not ignore or eviscerate with impunity the judgment of a duly elected legislative body."

The lower court then went on to say: "Arguing that this court should not compel enforcement of the ordinance against cosmeticians, [Vartoughian]

contends the legislation ignores her right to refuse a business service based upon a rational distinction not recognized by the ordinance. She contends that a public entity cannot compel her to provide a service which involuntarily exposes her to transmission of the AIDS virus. If the defendant can establish a *failure* of the ordinance to include a rational basis for classification, the court should not invoke its equitable power to compel the defendant to perform the business service."

The court concluded that the preponderance of the evidence supported the finding that pedicure techniques potentially expose a cosmetician and other patrons to the risk of AIDS infection, even though marginal, and that "any risk of death, however minimal, cannot be acceptable or tolerable."

Before addressing this issue the court undertook to distinguish this case from other cases which had been cited by the parties.

The court found that this case did not trigger the provisions of the Unruh Civil Rights Act (Civ. Code, § 51), nor was it controlled by *School Bd. of Nassau County* v. *Arline* (1987) 480 U.S. 273 [94 L.Ed.2d 307, 107 S.Ct. 1123], stating that *Arline* held narrowly that a person suffering from tuberculosis qualifies as a handicapped person within the meaning of the Rehabilitation Act of 1973 (29 U.S.C. § 794). The trial court observed that the Supreme Court declined to address the question of AIDS and thus the decision was not dispositive of the question before it. Lastly, the court stated that the West Hollywood ordinance did not involve or prohibit discrimination on the historically relevant grounds of race, religion, ancestry or gender, eliminating "strict scrutiny" as the applicable test. (*Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432 [87 L.Ed.2d 313, 105 S.Ct. 3249]; *Weber* v. *City Council* (1973) 9 Cal.3d 950 [109 Cal.Rptr. 553, 513 P.2d 601].)

The court then turned its attention to the rational basis test under the equal protection clause and concluded that "no basic right of plaintiff is asserted here." The court, as does the dissent, unfortunately focused on the specific service, a pedicure, rather than the true issue, which is the right under the ordinance of an AIDS patient to nondiscriminatory personal service of whatever nature. Having thus focused, the court said: "The ordinance ignores a rational basis for classification and fails to respect [respondents'] right not to be involuntarily exposed to a risk of personal harm."

■ The court expressed its view that "any risk of transmission is unacceptable." Once the court had concluded that the ordinance had been validly enacted the court's focus on whether the risk of transmission provided a legal basis to decline enforcement of the ordinance was erroneous since such

a conclusion implies that the legislative body has properly balanced competing interests.[5]

■ Legislative enactments are presumptively constitutional. (*McGowan v. Maryland* (1961) 366 U.S. 420, 425-426 [6 L.Ed.2d 393, 398-399, 81 S.Ct. 1101]; *Peters* v. *Superior Court* (1989) 212 Cal.App.3d 218, 226 [260 Cal.Rptr. 426].) " ' "All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their constitutionality clearly, positively and unmistakably appears. [Citations.]" ' " (*In re Benson* (1985) 172 Cal.App.3d 532, 534 [218 Cal.Rptr. 384], quoting *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296].)

■ An equal protection issue arises only when a legislative body enacts a law that affects one group of citizens differently from another group otherwise similarly situated. (*McGowan* v. *Maryland, supra*, 366 U.S. at p. 425 [6 L.Ed.2d at pp.398-399].) " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citation.]" (Italics omitted.) (*Smith* v. *Board of Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 324-325 [248 Cal.Rptr. 704], quoting *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].)

■ ■ The West Hollywood ordinance herein involved does not adopt a classification that treats similarly situated groups in an unequal manner. Rather, the ordinance prohibits discrimination against people with AIDS by "any business establishments." The only exceptions made are business establishments "engaged in the exchange of products containing

---

[5] Nothing in the ordinance permits a court to deny application of its provisions on the basis of the court's own assessment of the risk of transmission. In this respect, the ordinance differs from the federal statute involved in *School Bd. of Nassau County* v. *Arline, supra*, 480 U.S. 273, and *Chalk* v. *U.S. Dist. Court Cent. Dist. of California* (9th Cir. 1988) 840 F.2d 701. That statute, section 504 of the Rehabilitation Act of 1978 (29 U.S.C. § 794) prohibits federally funded state programs from discriminating against handicapped persons by reason of their handicaps if they are "otherwise qualified." (*School Bd. of Nassau County* v. *Arline, supra*, at p. 278 [94 L.Ed.2d at p. 315].) Thus, the risk of transmission of a contagious disease is relevant under that statute for the purpose of determining whether a person handicapped by reason of such disease is "otherwise qualified" and would require an evidentiary hearing. (*Id.*, at pp. 287-289 [94 L.Ed.2d ap pp. 320-322]; *Chalk* v. *U.S. Dist. Court Cent. Dist. of California, supra*, 840 F.2d at pp. 705-708.) Even under the federal statute, however, the person handicapped by reason of a contagious disease must pose "a significant risk" of transmission before he or she will be determined to be not otherwise qualified. (*Chalk* v. *U.S. Dist. Court Cent. Dist. of California, supra*, 840 F.2d at p. 705.)

Accordingly, even if we assumed that the court here had the discretion to decline to enforce the ordinance on the basis of the risk of transmission posed, clearly the "any risk" standard would still be inappropriate.

1110

elements of blood or sperm." Respondents are, obviously, not affected by this exception. Since no classification is adopted by the ordinance, it raises no issue of equal protection.

Even if a classification had been drawn, it would not invalidate the ordinance so long as the classification bore a rational relationship to a legitimate state interest or legislative purpose. (*Cleburne* v. *Cleburne Living Center, Inc., supra,* 473 U.S. at pp. 439-440 [87 L.Ed.2d at pp.319-321]; *Weber* v. *City Council, supra,* 9 Cal.3d at pp. 958-959.)

It was this rational relationship that the trial court apparently had in mind when it stated that if respondents could "establish a *failure* of the ordinance to include a rational basis for classification, the court should not invoke its equitable power to compel [respondents] to perform the business service." This formulation does not reflect the intended application of the rational basis test. The test is based on distinctions drawn, not distinctions which a judge feels should have been drawn. To hold otherwise would transform a judicial function into a legislative function.

As the trial court acknowledged, the power to make laws which touch upon the public health, safety and welfare lies with the Legislature. In *Cleburne* v. *Cleburne Living Center, Inc., supra,* 473 U.S. 432, the Supreme Court discussed laws applicable to the mentally retarded. Its language is generally applicable to other issues of public health: "How this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." (*Id.,* at pp. 442-443 [87 L.Ed.2d at p. 322].)

■ "The equal protection clause is not an authorization for the courts to second-guess the Legislature on the best way to deal with aspects of a problem. It protects classes of people from arbitrary discrimination." (*Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, 184, fn. 4 [183 Cal.Rptr. 881].)

■ The court erred in its decision because this ordinance is not vulnerable to an equal protection challenge, in that it clearly bears a rational relationship to a legitimate legislative purpose. The primary purpose of the ordinance is to protect people with AIDS from discrimination by providers of personal services. " '[T]he devastating effects of [AIDS] and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those that suffer from it.' " (*Raytheon Co.* v. *Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1252 [261 Cal.Rptr. 197].) "AIDS is the modern day equivalent of leprosy. AIDS, or a

suspicion of AIDS, can lead to discrimination in employment, education, housing and even medical treatment." (*Rasmussen* v. *South Florida Blood Service* (Fla. 1987) 500 So.2d 533, 537 [56 A.L.R.4th 739]; and see, e.g., *Raytheon Co.* v. *Fair Employment & Housing Com. supra,* 212 Cal.App.3d 1242 [employment discrimination]; *Chalk* v. *U.S. Dist. Court Cent. Dist. of California, supra,* 840 F.2d 701 [employment discrimination]; *Ray* v. *School Dist. of Desoto County* (M.D.Fla. 1987) 666 F.Supp. 1524 [exclusion of students with AIDS from school]; *Phipps* v. *Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110 [251 Cal.Rptr. 720] [same].) Clearly, the ordinance addresses a real and pressing concern.

Additionally, as the cities of Los Angeles, Santa Monica, and West Hollywood remind us in their amicus briefs, the ordinance serves an even larger public health function, for, by ensuring that persons with AIDS will not be discriminated against, it encourages them to disclose their status to providers of personal services and this latter group can then take precautions against transmission. Since there is neither a vaccine nor a cure for AIDS, precautionary measures are vital to preventing the spread of the disease. It has been found that denial of services tends to inhibit disclosure of a person's HIV status resulting in greater danger to the personal service providers. There was testimony in this case that 90 percent of infected individuals are asymptomatic; consequently, unless they disclose their status it would be impossible for the personal services provider to know whether or not a given individual is infected. This appears to be another basis for concluding that the ordinance is a rational expression of a legitimate legislative purpose.

## II

■ Respondents maintain that even if the ordinance is facially valid, it is unconstitutional as applied to them. We find no merit in this contention.

As was explained in the leading case of *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 297 [124 Cal.Rptr. 204, 540 P.2d 44]: "[A]n equal protection violation does not arise whenever officials 'prosecute one and not [another] for the same act' (cf. *People* v. *Montgomery* [1941] 47 Cal.App.2d 1, 13 [117 P.2d 437]); instead, the equal protection guarantee simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis. . . . [T]he doctrine . . . simply requires that the authorities enforce the laws even-handedly."

There was no evidence in this case that respondents were singled out for disparate treatment. Rather, respondents became the object of this action because they violated the ordinance by refusing appellant service.

■ Finally, we find no legal basis for respondents' contention that enforcement of this antidiscrimination ordinance is tantamount to requiring specific performance of a contract to perform personal services. Here, there is no contract for personal services as opposed to a general contract to provide a service on the same basis that it is provided to the general public. (Cf. *Leach* v. *Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362, 368-369 [192 Cal.Rptr. 650].)

No legal challenge to the ordinance having been supported, the judgment is reversed. Appellant to have his costs on appeal.

McClosky, J., concurred.

**GOERTZEN, J.**—I dissent. Appellant in this matter passed away on May 15, 1989. A motion to dismiss was filed by respondents on May 31, 1989. This motion was opposed by appellant and denied by this court on June 15, 1989, prior to the case being fully briefed. While I initially agreed with my colleagues to deny the motion to dismiss, I now feel that this case should be dismissed as moot.

"It is well settled that an appellate court will decide only actual controversies. Consistent therewith, it has been said that an action which originally was based upon a justiciable controversy cannot be maintained on appeal if the questions raised therein have become moot by subsequent acts or events." (*Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 10 [244 Cal.Rptr. 581]; see also *Environmental Coalition of Orange County, Inc.* v. *Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 170 [167 Cal.Rptr. 735].)

Like my colleagues, I am not insensitive to the fact that the " 'devastating effects of [AIDS] and widespread lack of knowledge about it have produced deep anxieties, and considerable hysteria, about the disease and those that suffer from it.' " (*Raytheon Co.* v. *Fair Employment & Housing Com.* (1989) 212 Cal.App.3d 1242, 1252 [261 Cal.Rptr. 197].) Most importantly, I recognize that "AIDS is the modern day equivalent of leprosy. AIDS, or a suspicion of AIDS, can lead to discrimination in *employment, education, housing and even medical treatment.*" (*Rasmussen* v. *South Florida Blood Service* (Fla. 1987) 500 So.2d 533, 537 [56 A.L.R.4th 739], italics added.)

But it must be noted that with respect to this dreaded disease, the hysteria and fear generated by it, and the potential for discrimination against the poor victims of this scourge, the case at bar does not deal with discrimination in employment, education, housing, or medical treatment. This case

deals with the denial of one of the least important personal services in our society—a pedicure.

The factual context of this case does not mandate a decision in face of the death of appellant. The appeal should be dismissed.

With respect to my change of mind occurring since the earlier denial of the dismissal motion, I adopt the cogent concurring opinion of Supreme Court Justice Stanley Mosk in the case of *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 645-646 [63 Cal.Rptr. 391, 433 P.2d 183].