390 S.E.2d 814

**BENJAMIN R.**

v.

**ORKIN EXTERMINATING COMPANY, INC.**

No. 19277.

Supreme Court of Appeals of West Virginia.

March 8, 1990.

Concurring Opinion March 9, 1990.

Patrick S. Cassidy, O'Brien, Cassidy & Gallagher L.C., Wheeling, for Benjamin R.

William D. Wilmoth, Schrader, Stamp, Byrd, Byrum & Companion, Wheeling, Martha Perrin, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, Ga., for defendant.

William D. Turner, Crandall & Pyles, Charleston, for amici curiae, Charleston AIDS Network, et al.

McHUGH, Justice:

This case is before this Court upon a certified question from the United States District Court for the Northern District of West Virginia, pursuant to *W.Va.Code*, 51–1A–1 to 51–1A–12 [1976], the Uniform Certification of Questions of Law Act. The certified question involves whether a person who tests positive for the human immunodeficiency virus antibodies has a "handicap" within the meaning of the West Virginia Human Rights Act as effective prior to the 1989 amendment thereto. For the reasons discussed below, we answer in the affirmative.

I

Benjamin R., the plaintiff in the underlying action, commenced work in May, 1986, as a pest control inspector for the defendant, Orkin Exterminating Company, Inc.[1] In January, 1987, he tested "seropositive" in blood tests for the human immunodeficiency virus ("HIV") antibodies, a clinical precursor to acquired immune deficiency syndrome ("AIDS"), the last phase of the incurable HIV disease. HIV is a suppression of the human body's immune system, and the complications resulting from HIV are eventually fatal in virtually every case. The virus cannot survive outside of white

1. Consistent with our practice in cases involving sensitive matters, we use the plaintiff's last initial rather than his last name. *See In re Jona-* *than P.,* 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989) (citing cases).

blood cells; if exposed to the air it will die. HIV is communicable by certain types of contact but cannot be transmitted by casual contact. *E.g., Leckelt v. Board of Commissioners of Hospital District No. 1,* 714 F.Supp. 1377, 1380 (E.D.La.1989).[2]

The plaintiff told his supervisor about the HIV test results in July, 1987. The plaintiff claims he was discharged, in August, 1987, because he has HIV. The defendant claims the plaintiff voluntarily resigned from work to stay with relatives in South Carolina. Acting upon the plaintiff's complaint of employment discrimination on the basis of a handicap, the West Virginia Human Rights Commission decided, pursuant to *W.Va.Code,* 5–11–13(b) [1983], to issue to the plaintiff a notice of his right to sue in a state circuit court. The plaintiff thereafter brought an employment discrimination action against the defendant in the Circuit Court of Ohio County, West Virgi-

nia. The defendant, pursuant to federal law, removed the action to the United States District Court for the Northern District of West Virginia. After some discovery the defendant moved for summary judgment on the ground that the plaintiff, as a matter of West Virginia law, was not handicapped. The federal court, finding no controlling precedent decided by this Court, certified the following question to us:

> Whether, as a matter of West Virginia law, a person who tests positive for the human immunodeficiency virus (HIV positive) is handicapped within the meaning of W.Va.Code § 5–11–3(t)?

## II

The West Virginia Human Rights Act, *W.Va.Code,* 5–11–1 to 5–11–19, as amended, contains a declaration of policy, the pertinent part of which is as follows: "It is the public policy of the state of West Virgi-

2. The medical evidence in the record, such as the 1988 reports of the Surgeon General and of the Presidential Commission on HIV, indicate the following basic facts about HIV.

HIV kills certain white blood cells, T-lymphocytes, and in so doing, effectively cripples the body's ability to ward off other diseases. The Centers for Disease Control ("CDC") of the United States Department of Health and Human Services have classified HIV-infected persons in four groups based upon the character of their symptoms. CDC Group I consists of persons with transient, mononucleosis-like symptoms (swollen lymph glands, fatigue, fever).

Persons in CDC Group II, formerly referred to as asymptomatic carriers, do not suffer debilitating symptoms, but already have abnormalities in their hemic (blood) and lymphatic systems and are capable of infecting others. After the temporary CDC Group I phase, the average time between infection and obvious, chronic symptoms, that is, the average time for the asymptomatic CDC Group II phase, is several years. The plaintiff here falls within the CDC Group II classification.

CDC Group III consists of HIV-infected persons with serious but not life-threatening symptoms, such as persistent swollen lymph nodes. This phase is also called PGL, persistent generalized lymphadenopathy.

CDC Group IV comprises HIV-infected persons with clinical manifestations and includes several subgroups, with indications ranging from at least two chronic physical symptoms such as PGL and weight loss or persistent fever or fatigue (CDC Group IV–A), also referred to as AIDS Related Complex (ARC), to neurological

manifestations (CDC Group IV–B), to end-stage or "full-blown" AIDS (CDC Groups IV–C to IV–E), in which the HIV virtually destroys the immune system, leaving the infected individual vulnerable to various so-called "opportunistic" diseases, which eventually cause death. Two common types of opportunistic diseases associated with HIV infections are *pneumocystis carnii* pneumonia (PCP) and a form of skin cancer known as Karposi's sarcoma. Once a person is diagnosed as having "full-blown" AIDS, that person's life expectancy is generally about two years. There is neither a preventive medicine nor a cure for HIV.

HIV is spread primarily in two ways: (1) through sexual contact, homosexual or heterosexual, with an infected person (HIV was detected first in homosexual males) and (2) through the sharing of syringes used for injecting drugs intravenously. To a lesser extent HIV can be spread through blood transfusions and from mother to child in the womb (and possibly through breast milk).

Significantly, as mentioned in the text, HIV is *not* transmitted through casual contact in the workplace or in the home. For example, there is no evidence of transmission of HIV through sharing of food, cups, towels, razors, toothbrushes, or through kissing. (Health care workers must take special precautions, due to the risk of being stuck with needles containing HIV-contaminated blood and due to the risk of other "invasive" contact with the virus.)

*See, e.g.,* Baxley, *Rehabilitating AIDS–Based Employment Discrimination: HIV Infection as a Handicap Under the Vocational Rehabilitation Act of 1973,* 19 Seton Hall L.Rev. 23, 27–32 (1989) (citing medical studies).

nia to provide all of its citizens equal opportunity for employment, ... Equal opportunity in the area[ ] of employment ... is hereby declared to be a human right or civil right of all persons without regard to ... handicap." *W. Va. Code*, 5–11–2 [1981].[3] In furtherance of this policy *W. Va. Code*, 5–11–9 [1981] provides, in relevant part:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, ...

(a) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is ... handicapped[.] [4]

The term "discriminate" or the term "discrimination" means "to exclude from, or fail or refuse to extend to, a person equal opportunities because of ... [a] handicap[.]" *W. Va. Code*, 5–11–3(h) [1981, 1989].

The term "handicap" means "any physical or mental impairment which substantially limits one or more of an individual's major life activities." *W. Va. Code*, 5–11–3(t) [1981]. Therefore, the statutory definition of "handicap" at the time in question had two basic requirements: (1) a "physical or mental impairment" (2) which substantially limits one or more "major life activities." [5]

The West Virginia Human Rights Act, as effective at the time in question, did not define "physical or mental impairment" or "major life activities." The rules of the West Virginia Human Rights Commission,

based upon the federal regulations under the Federal Rehabilitation Act of 1973, as amended, do provide definitions of these terms.[6]

"Physical impairment" means "any physiological disorder or condition or cosmetic disfigurement or anatomical loss or abnormality affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, *hemic* [blood] and *lymphatic*." 6 *W. Va. Code of State Rules* § 77–1–2.2 (1982) (emphasis added). Another definition provided is that a "physical or mental impairment"

includes, but is not limited to, such *diseases* and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, autism, multiple sclerosis, cancer, diabetes, heart disease, obesity, drug addiction, tobacco addiction and alcoholism. However, use or abuse of alcohol, tobacco or drugs in the absence of medically verifiable addiction does not constitute a 'Physical or Mental Impairment.'

6 *W. Va. Code of State Rules* § 77–1–2.4 (1982) (emphasis added).

Finally, the term "major life activities" is defined in a noninclusive manner; it *"includes* [not "means"] communication, ambulation, self-care, *socialization*, learning, vocational training, employment, transportation and adapting to housing." 6 *W. Va. Code of State Rules* § 77–1–2.5 (1982) (emphasis added).[7]

---

**3.** *W. Va. Code*, 5–11–2 was amended in 1989, after the operative facts in this case, but the relevant portion of this statute, quoted in the text, was not changed.

**4.** *W. Va. Code*, 5–11–9 was amended in 1989, after the operative facts in this case, but the relevant portion of this statute, quoted in the text, was not substantively changed.

**5.** The 1989 amendment to *W. Va. Code*, 5–11–3(t), effective after the operative facts in this case, is not applicable here. As indicated in note 10 of *Chico Dairy Co. v. West Virginia Human Rights Commission*, 181 W.Va. 238, 248, 382 S.E.2d 75, 85 (1989), the West Virginia statutory definition of "handicap," *W. Va. Code*, 5–11–3(t), is now identical to the tripartite federal statutory defi-

nition set forth in 29 *U.S.C.* § 706(8)(B) (1988). The federal statute defines an "individual with handicaps," for purposes of the Federal Rehabilitation Act of 1973, as amended, to mean any person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

**6.** The Federal Rehabilitation Act of 1973, as amended, is codified as 29 *U.S.C.* §§ 701–796i (1988).

**7.** The 1989 amendment to *W. Va. Code*, 5–11–3(t), the state statutory definition of "handicap," added, *inter alia*, a noninclusive definition of the term "major life activities"; that term "includes

HIV, even during the asymptomatic phase (CDC Group II, *see supra* note 2), is a "physiological disorder ... affecting ... [the] hemic [blood] and lymphatic" body systems. 6 *W.Va.Code of State Rules* § 77–1–2.2 (1982). As Surgeon General Koop stated in a July 29, 1988 letter to the United States Department of Justice, the CDC Group II phase involves

subclinical manifestations[,] i.e., impairments[,] and no visible signs of illness. The overwhelming majority of infected persons [in CDC Group II] exhibit detectable abnormalities of the immune system....

Accordingly, from a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B. Like a person in the early stages of cancer, they may appear outwardly healthy but are in fact seriously ill.

Our research discloses that the court in every reported case discussing the point has recognized that HIV, even during the asymptomatic phase, is an actual, physical impairment under a federal or state statute or regulation defining such an impairment in terms identical or similar to this state's administrative rule quoted immediately above, namely, 6 *W.Va.Code of State Rules* § 77–1–2.2 (1982). *See, e.g., Baxter v. City of Belleville,* 720 F.Supp. 720, 725, 729 (S.D.Ill.1989) (immunological deterioration begins on first day of infection with HIV) (also could be a perceived handicap, that is, within third part of statutory definition of "handicap," involving a person who is "regarded as" having such an impairment, *see supra* note 5, due to unfounded fear of contagion from casual contact); *Leckelt v. Board of Commissioners of Hospital District No. 1,* 714 F.Supp. 1377, 1385 & n. 4 (E.D.La.1989) (seropositivity

itself an impairment) (also could be a perceived handicap); *Ray v. School District of DeSoto County,* 666 F.Supp. 1524, 1529, 1536 (M.D.Fla.1987) (when HIV enters body it begins to attack certain white blood cells) (seropositive students granted preliminary injunction enabling them to remain in regular classroom); *Thomas v. Atascadero Unified School District,* 662 F.Supp. 376, 379, 381 (C.D.Cal.1987) (individuals in all four of CDC classifications suffer from impairments to their physical systems and are "handicapped"); *Local 1812, American Federation of Government Employees v. United States Department of State,* 662 F.Supp. 50, 54 (D.C.Cir.1987) (HIV-infected persons are physically impaired, due to measurable deficiencies in their immune systems, even where disease symptoms have not yet developed); *Raytheon Co. v. Fair Employment & Housing Commission,* 212 Cal.App.3d 1242, 1249, 261 Cal. Rptr. 197, 201 (1989) (HIV disease is a progressive immune system disease, and AIDS is end stage of this gradual immune system deterioration); *Cronan v. New England Telephone Co.,* 41 Fair Empl. Prac.Cas. 1273, 1275, 1276 (Mass.Super.Ct.1986) (HIV within definition of physical impairment regardless of whether person is suffering any adverse physical effects) (also could be a perceived handicap); *Doe v. Coughlin,* 71 N.Y.2d 48, 57, 518 N.E.2d 536, 542, 523 N.Y.S.2d 782, 788 (1987) (once acquired, HIV undermines human body's ability to combat infection, is incurable and is almost always fatal), *cert. denied,* 488 U.S. 879, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).[8] *See also* Baxley, *Rehabilitating AIDS–Based Employment Discrimination: HIV Infection as a Handicap Under the Vocational Rehabilitation Act of 1973,* 19 Seton Hall L.Rev. 23 (1989); Lally–Green, *Is AIDS a Handicap Under the Rehabilitation Act of 1973 Af-*

---

[not "means"] functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working[.]" *W.Va.Code,* 5–11–3(t)(1) [1989]. The state *statute* still does not define "physical or mental impairment[.]"

**8.** The Supreme Court of the United States in *School Board v. Arline,* 480 U.S. 273, 107 S.Ct.

1123, 94 L.Ed.2d 307 (1987), held that a person with a contagious disease, in that case, tuberculosis, may also be a "handicapped individual" under the Federal Rehabilitation Act of 1973, as amended. The court expressly did not reach the question of whether a person with HIV, but currently asymptomatic, is a person with a "handicap." *Id.* at 282 n. 7, 107 S.Ct. at 1128 n. 7, 94 L.Ed.2d at 317 n. 7.

*ter School Board v. Arline and the Civil Rights Restoration Act of 1987?*, 19 U.Tol. L.Rev. 603 (1988); Note, *Asymptomatic Infection with the AIDS Virus as a Handicap Under the Rehabilitation Act of 1973*, 88 Colum.L.Rev. 563 (1988); Leonard, *Employment Discrimination Against Persons with AIDS*, 10 U.Dayton L.Rev. 681 (1985). *See generally*, 3A A. Larson & L. Larson, *Employment Discrimination* § 108A.21 (1988); 3 C. Sullivan, M. Zimmer & R. Richards, *Employment Discrimination* § 25.2.1, § 25.2.4, at 14 (2d ed. 1988 & Supp.1989); A. Ruzicho, L. Jacobs & L. Thrasher, *Employment Discrimination Litigation* § 4.07, at 222 (1989); L. Rothstein, *Rights of Physically Handicapped Persons* § 4.03, at 93–95 (Supp.1990); M. Player, *Employment Discrimination Law* § 7.09, at 595 (1988).

Asymptomatic infection with HIV is not only a physical impairment but such impairment "substantially limits one or more of an individual's major life activities." *W.Va.Code*, 5–11–3(t) [1981].[9] As stated previously, the term "major life activities" includes "socialization[.]" 6 *W.Va.Code of State Rules* § 77–1–2.5 (1982). The record here indicates that medical experts have found almost all HIV patients to be severely withdrawn and depressed, often suicidal, virtually throughout the course of the disease, in light of, *inter alia*, the fatal nature of the complications resulting from the disease. HIV thus has an inherent propensity to interfere with the HIV patient's "socialization," independent of the perceptions of others. *Cf. Consolidated Freightways, Inc. v. Cedar Rapids Civil Rights Commission*, 366 N.W.2d 522, 527–28 (Iowa 1985) (chronic alcoholism a "disability," defined as a physical or mental condition having an inherent propensity to limit one or more of an individual's major life activities, independent of perceptions of others, as chronic alcoholism results in substantial interference with an individual's ability to

function socially or economically in community).[10]

We find unpersuasive the very recent opinion of the North Carolina Supreme Court in *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 388 S.E.2d 134 (1990). There the court held that asymptomatic infection with HIV does not limit one or more major life activities. The court believed it was significant that the state statutory definition of "major life activities" was identical to the federal regulations' definition of that term, with the sole exception that the state definition did not include the word "working," indicating to the court that "working" was not a major life activity under the state statute. The court also believed that the ability to bear a healthy child and the ability to engage in sexual relationships were not major life activities because in the court's view those two activities are not essential tasks one must perform on a regular basis in order to carry on a normal existence. In addition, the court observed that the state statute contained an explicit exception from coverage for communicable diseases. Finally, the court noted that antidiscrimination legislation explicitly applicable to persons with HIV was enacted after the *Burgess* case arose.

As discussed above, asymptomatic infection with HIV substantially limits the major life activity of "socialization," which is included within this state's definition of "major life activities." Moreover, this state's definition of "physical or mental impairment" includes "diseases," without excluding communicable diseases. Finally, no antidiscrimination legislation explicitly applicable to persons with HIV has been recently enacted in this state; therefore, we cannot infer that the legislature meant to exclude persons with HIV from the existing "handicap" provisions of the West Virginia Human Rights Act.

An important public health concern is implicated by the certified question in this

---

**9.** *See supra* note 5.

**10.** We need not decide whether asymptomatic infection with HIV substantially limits other purported major life activities, such as procrea-

tion, "intimate personal relations" or the ability to resist infections, as argued by the plaintiff and by *amici curiae*, the Charleston Aids Network *et al.*

case. About ninety percent of HIV-infected individuals are at a given time asymptomatic. Unless they are tested for the disease and disclose their status, it is impossible to know whether such individuals have HIV and are capable of spreading the disease through the limited means stated in note 2 *supra.* HIV-infected individuals are hesitant to have an HIV antibody test performed because, *inter alia,* they are concerned about discrimination in employment and other matters should they test positive and should the test results be disclosed. Including asymptomatic infection with HIV under the definition of a person with a "handicap" encourages early testing for the disease and disclosure of the test results. From a public health standpoint, it is crucial for people at all stages of HIV infection to be assured of legal protection from unlawful discrimination. *See School Board v. Arline,* 480 U.S. 273, 286 n. 15, 107 S.Ct. 1123, 1130 n. 15, 94 L.Ed.2d 307, 320 n. 15 (1987); *Jasperson v. Jessica's Nail Clinic,* 216 Cal.App.3d 1099, 1111–12, 265 Cal.Rptr. 301, 308 (1989).

In view of the foregoing this Court holds that a person at any stage of infection with the human immunodeficiency virus, including a person who has tested positive for the antibodies to such virus but who is asymptomatic, is a person with a "handicap" within the meaning of *W.Va.Code,* 5–11–3(t) [1981].[11]

Accordingly, the certified question is answered in the affirmative.

Having answered the certified question, we dismiss this case from the docket of this Court.

Certified question answered; case dismissed.

NEELY, Chief Justice, concurring:

I concur with the majority in this case that acquired immuno-deficiency syndrome (AIDS) is a handicap. The more difficult questions, however, are what type of "reasonable accommodations" must be extended to human immuno-deficiency virus (HIV) positive job applicants and employees, and whether under any circumstances these HIV-positive subjects are "otherwise qualified" for employment. As footnote 11 of the majority opinion expressly states, these issues have not been considered by the majority in this case. In my estimation, however, the issue framed by the U.S. District Court is so abstract that it is like the sound of one hand clapping; an answer to the question as framed, without elaboration, is likely to be misleading to the Human Rights Commission and the courts.

If, indeed, AIDS is a handicap, but no amount of "reasonable accommodation" will succeed in protecting other workers and customers from infection, then the whole exercise of determining handicap becomes a waste of time. In that event the plaintiff gets a right without a remedy. This was probably the effect of *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), where the U.S. Supreme Court said:

> A person who poses a significant risk of communicating an infectious disease to others in the work place will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk.

*Id.* at 287, n. 16, 107 S.Ct. at 1131, n. 16.

### I.

Initially, it is important to point out that AIDS is not properly a moral issue, a political issue, or a religious issue: AIDS is a public health issue. Although the majority opinion cites legal literature concerning the public health implications of mainstreaming HIV-positive subjects, I believe that the majority opinion is inadequately persuasive. The public health dimensions of this important issue are too lightly touched

---

11. We note that there are two matters which are not before us in this case. First, there is a factual dispute in the underlying action as to whether the defendant discharged the plaintiff because he has HIV. Second, there is no issue before us as to what "reasonable accommoda- tions" by the employer would protect the health of the HIV-infected individual, of other employees or of the public. *See Ranger Fuel Corp. v. West Virginia Human Rights Commission,* 180 W.Va. 260, 264–265, 376 S.E.2d 154, 159–60 (1988).

upon by reference to *legal* literature because the issue of contagion cannot be as simply dismissed as the majority would imply.

At the center of the public health issue is an understandable tension between the average American's urge toward compassion and the average American's understanding of lifeboat ethics. If there are twenty people in a lifeboat, and the likelihood is fifty percent that an additional person will capsize the boat, acting compassionately is logically foreclosed. On the other hand, if the likelihood of capsize with an additional person is but one in a thousand, then almost everyone would welcome an additional stranded swimmer into the boat.

Explained another way, the considerations that inform the average American's understanding of AIDS are the same considerations that inform the average American's understanding of nuclear power. Ironically, if one analyzes the opinions of different socio-economic and political groups through the national publications those groups support—*The New Republic, The National Review, The New York Review of Books, Commentary, The Atlantic Monthly,* and *The Public Interest*—it appears that many groups that most strongly advocate the mainstreaming of HIV-positive subjects (AIDS patients) frequently oppose nuclear power, while many groups that advocate nuclear power urge the quarantine of HIV-positive subjects.

This observation, rough as the head count may be, simply demonstrates that the way the average American feels about HIV-positive subjects is likely to be informed by how he feels about homosexuals, IV drug users, prostitutes, and promiscuous persons—the groups in society that have the highest statistical risk of becoming HIV-positive. Similarly, how the average American feels about nuclear power is likely to be informed by how he feels about big corporations, the equity of passive income from stock ownership, and the desirability of a technologically simpler America.

Although nuclear power may be far from this case, I introduce the subject to demonstrate that reluctance to accept mainstreaming of HIV-positive subjects is not just a simple matter of irrational hatred of homosexuals, high-risk minorities, prostitutes or drug users. Just how easy it is to fear the unknown, and just how little faith the average person has in the opinions of experts, are prominent features of both the AIDS and the nuclear power debate.

Thus, regardless of what the Centers for Disease Control say about the extraordinarily specific and quite limited ways in which AIDS can be transmitted, and regardless of what physicists at M.I.T. or the Nuclear Regulatory Commission say about the safety of our new generation of nuclear power plants, the average American is disinclined to take even a vanishingly small chance of dying the horrible death of AIDS or being incinerated in a nuclear explosion. At heart, the average person thinks about all probability of accident in roughly the same light: Differences between probability of accident of $10^{-3}$ (one in a thousand) and probability of accident of $10^{-7}$ (one in ten million) are all the same. But, of course, they're not.

After a careful review of the literature, much of which is cited below, I have concluded that there is such a small chance of contracting AIDS from the normal, casual contact of the workplace or the school that the possibility of such transmission in the course of protracted, casual contact is of an order of magnitude no higher than between $10^{-5}$ and $10^{-6}$ (one in one-hundred-thousand and one in a million). However, this is not a conclusion that easily impresses itself upon the average well-read American. Specifically, two factors are likely to make the average American fearful: First, because AIDS *is* a political issue, it is not beyond possibility that official U.S. Government information is slanted and not entirely accurate.[1] Second, individual studies of the mechanics of HIV transmission necessarily involve small samples over short

---

1. It is for this reason that I have consulted studies conducted in Europe, particularly France, where different politics apply.

periods [2]; therefore, these studies cannot individually exclude the possibility of transmission by casual contact (i.e., accidental spitting; use of unwashed silverware, plates and cups; urine in public lavatories; touching, etc.) to a greater extent than some order of magnitude between $10^{-3}$ and $10^{-4}$ (i.e., one in a thousand and one in ten thousand.)

When, therefore, we are talking about an occurrence whose outcome is always a horrible death, probabilities of error of $10^{-3}$ (or even $10^{-4}$) are not odds that any of us would take without a very good reason (such as one of our own children contracting AIDS). Few of us would fly if the probability of crashing were $10^{-4}$. However, we all do fly, at least occasionally, because the probability of crashing is between $10^{-5}$ and $10^{-6}$ (one in a hundred thousand and one in a million.) Thus the purpose of this concurrence is to recognize and discuss the entirely rational fears of the general public in an effort to justify today's decision in terms that satisfy those who are legitimately fearful that the *legal* conclusions we reach are not justified by *science.*

## II. -

The anxiety of the average American about transmission of AIDS through casual contact is prompted by language such as this from the April 1987 *Harvard Medical School Health Letter:*

In the United States, studies of household contacts have not found any evidence of transmission [by casual contact]. There have been some possible cases in babies, but infection during pregnancy or birth has been the *probable* route of infection. Although *there's*

*a remote theoretical possibility* that insects could transmit the disease, no evidence indicates this is a real route of spread. [emphasis added]

Or, the following conclusions about probable error in a study of AIDS published 29 October 1987 in *The New England Journal of Medicine:*

Of the more than 30,000 cases of AIDS in the United States reported to the Centers for Disease Control by February 1987, none have occurred in family members of patients with AIDS, unless members have had other recognized risk-related behavior. More direct and precise risk information can be derived from a number of studies in which nearly 500 family members of patients with AIDS were evaluated for evidence of infection. [footnotes and tables omitted] The index patients with AIDS have included intravenous drug abusers, homosexual and bisexual men, recipients of blood transfusions, persons with hemophilia, and others. These studies failed to demonstrate a single HIV infection among household members who did not have additional exposure to HIV infection through blood, sexual activity, or perinatal transmission. *Combining these negative studies reveals an upper 95 percent confidence limit for risk of 0.64 percent....* [3] [emphasis added]

This *N.E.J.M.* report presents us with a probability of error of 6.4 in 1,000, (with a 5 percent chance that that probable error is inaccurate) or a probability of error between $10^{-2}$ and $10^{-3}$.

Finally, it is instructive to read paragraph 2–16(2) from *Army Regulation* 600–110, entitled "Identification, Surveillance, and Administration of Personnel Infected

**2.** See, for example, the study by Sally Bruce Turner and her colleagues at the Harvard School of Public Health concerning embalmers, who are often exposed to large amounts of blood in their work. Dr. Turner studied 129 embalmers without other risk factors for AIDS and 4 with at least one such risk factor. As a group, the embalmers had handled bodies of 300 people that had died of AIDS. None of the 129 without other risk factors had a positive blood test for HIV, but one of the 4 with other risk factors did. This study offers evidence that

AIDS is not highly contagious and requires quite specific behaviors to be transmitted, but the relationship between the one positive subject and his "other risk factors" is inconclusive. The sample is simply too small. *American Journal of Public Health,* October 1989, pp. 1425–1426.

**3.** G.H. Friedland and R.S. Klein, "Transmission of the Human Immunodeficiency Virus," *New England Journal of Medicine,* 29 October 1987 at p. 1132.

with Human Immunodeficiency Virus (HIV)":

> Casual contact poses *negligible* risk of transmission. HIV infection has been shown to be primarily transmitted through three routes: intimate sexual exposure; perinatal exposure (from infected mothers to their infants); and parenteral exposure (transfusion of contaminated blood or sharing of needles by intravenous drug abusers). Since the virus has been isolated from various body fluids (to include blood, semen, saliva, tears, and breast milk), personal items such as toothbrushes, razors, and other personal implements that could become contaminated with blood or other fluids should not be shared with others, even though the risk appears low.[4] [emphasis added]

Consequently, if an average, well-read American were to read the material I have just cited without consulting all studies together, he or she would be reluctant to conclude that scientists have definitely *excluded* the possibility of transmission by casual contact to such a degree of certainty that a person could confidently bet his life on those scientists' findings. Thus, at the end of the day we are not just concerned with the *known* probability that HIV can be transmitted by casual contact, but also with the probability that there is something about the HIV transmission mechanism of which we are utterly ignorant.

### III.

However, what persuasively shows (from a public health point of view) that mainstreaming HIV-positive subjects is appropriate is that *all of the studies taken together* demonstrate that the likelihood that there is something about the mechanism of HIV transmission of which we are ignorant is vanishingly small. In other words, although the individual studies do not exclude the possibility of transmission by casual contact to a degree of certainty that

would give us abiding confidence in any individual study's conclusions, *all studies taken together* give us, in effect, a "mega study" upon whose results we can confidently rely. Thus, it is correct to say that having an HIV-positive subject prepare food, work alongside of an uninfected person, or attend school with uninfected children, presents a possibility no greater than between $10^{-5}$ and $10^{-6}$ (i.e., one in a hundred thousand and one in a million) of transmission of the disease *unless there is a direct exchange of blood,* or perhaps a large exchange of other body fluids such as saliva.

Furthermore, to put the rest of the discussion that follows into perspective, it makes *absolutely no difference* from a public health point of view whether we avoid (or even quarantine) those comparatively few people who have already been diagnosed HIV-positive. We are already surrounded by HIV-positive subjects who *do not themselves know* that they carry the virus. By isolating, shunning and avoiding HIV-positive subjects, as the majority opinion clearly points out, we merely introduce an element of humiliation into the otherwise burdened lives of the infected and at the same time *increase* rather than decrease the likelihood of deadly exposure to ourselves and our families.

This last conclusion comes from the fact that ostracizing HIV-positive subjects discourages people from being tested. Yet it is the knowledge that proceeds from test results that prompts people to take necessary precautions to protect their sexual partners and others, like doctors, who might come in contact with their blood. Indeed, mathematical models developed by public health researchers conclusively demonstrate that for every diagnosed case of AIDS in the United States, there are *at least* sixteen (and, perhaps, as many as twenty-two) HIV-positive subjects who

---

**4.** Headquarters, Department of the Army, Washington D.C. 11 March 1988. I have consulted U.S. Army authority because the Army is one of the greatest public health institutions in the world. A major mission of the Army is to keep its personnel healthy enough to fight anywhere in the world and under all conditions. Indeed, it was the U.S. Army that discovered how to eradicate yellow fever.

have not been diagnosed and do not know that they carry the virus themselves.[5] This means that there are at least three-and-a-half million undiagnosed HIV carriers in the general population, and perhaps as many as five million.

Therefore, we have all had our food cooked by HIV-positive subjects, had our hair cut and permed by them, been served by them in restaurants, had them in our houses as repairmen, and been coughed and spat upon by them in buses, trains, airplanes, hospital waiting rooms, and the line at the Department of Motor Vehicles. Yet unless we are: (1) practicing homosexuals; (2) IV drug users; (3) indulgers in unprotected casual sex; (4) prostitutes or their customers; (5) hemophiliacs or other recipients of bad blood; or (6) children of HIV-positive mothers, we are not HIV-positive ourselves.

## IV.

There is an urgent public health need to have as many persons as possible tested for the HIV virus so that HIV-positive subjects can protect others. The evidence is overwhelming that, while homosexuals have significantly altered their sex practices to reduce dramatically the transmission of HIV, heterosexuals have not. Although the risk of HIV transmission through heterosexual intercourse (except anal intercourse) is much lower than in male, homosexual intercourse, transmission by heterosexual intercourse is nonetheless widespread. In Africa, in fact, heterosexual transmission through normal vaginal intercourse has probably been the most prominent way in which the disease has spread.[6] Definite conclusions concerning whether this experience can be repeated in the United States have not been reached. It appears that heterosexual transmission is related to "other risk factors" but the specifics of these other factors are not yet entirely understood.

Adolescents and adults still continue to engage in casual heterosexual coupling without the protection of condoms. In a simple model in which each partner engages in sex with but three different persons a year, the routes of transmission can be seen to multiply exponentially from the person with whom one is sleeping and whom one thinks one knows, to countless others whom one does not know. When we begin thinking about "reasonable accommodation" requirements, we must constantly bear in mind that, counter-intuitive though it might at first appear, the world will be a much safer place if HIV-positive subjects are *not* fired when news of their infection reaches employers and co-workers.

During the first two to seven years (depending on other risk factors) of HIV infection, those infected demonstrate no obvious symptoms of the disease. Thereafter, when AIDS related complex (ARC) and full-blown AIDS become manifest, the subjects become too sick to work anyway. In these stages of the disease, AIDS patients are in far greater jeopardy from the uninfected population than the uninfected population are from them. A common cold can kill a person with full-blown AIDS. Therefore, when we talk of handicapped status protection for those diagnosed HIV-positive, we are not concerned with persons who are deathly ill (because they are not "otherwise qualified"), but rather with asymptomatic persons (or persons with mild ARC) who, for many years, can work quite normally.

## V.

From a careful review of the applicable literature, it is possible to reach some conclusions concerning how the HIV virus is

5. Allan M. Salzberg *et al.,* "The Past and Future History of HIV in the U.S.," unpublished manuscript on file in the W.Va. Supreme Court Law Library, summarized in "The Relation Between AIDS Cases and HIV Prevalence," letter to the editor, *New England Journal of Medicine,* 6 April 1989.

6. T.C. Quinn *et al.,* "Pilot Project AIDS in Africa: An Epidemiologic Paradigm," 234 *Science* 955–63 (1986).

transmitted and how it is not transmitted.[7] These conclusions, in turn, should instruct our understanding of the dimensions of "reasonable accommodation" in the workplace and the school.

HIV is transmitted primarily through sexual contact or through exposure to blood injected directly into the body, either by contaminated needles or by contaminated blood products, but not by "casual contact." A few cases are acquired by newborn babies during passage through the birth canal of an infected mother. By definition, casual contact does *not* include sexual contact or contact with contaminated needles. Also, by definition, "casual contact" does not include contact with blood such as might occur in a health care setting. However, "casual contact" does include contact with saliva in the form of spit or droplets of saliva that might spray forth from the mouth during ordinary speech, contact with tears, and even contact with urine. Ordinarily, contact with urine is unusual except amongst young children in a day care setting.

The largest study of persons exposed to saliva involved 1,309 dental professionals. It included 1,131 dentists, 131 hygienists and 46 assistants. All practice in the New York City area, where the HIV virus is prevalent. Ninety-four percent reported accidentally puncturing their skin with instruments used in treating patients. Most had several such skin punctures, and 21 percent had positive hepatitis B antibodies. This is an extremely high rate for hepatitis B and indicates the strong likelihood that

these dentists and assistants had acquired hepatitis from contact with their patients' saliva and blood. Evidence of HIV virus transmission by saliva could be found in only one case. The dentist involved frequently practiced without gloves even though he often had obvious breaks in his skin. Furthermore, he estimated that he had received two accidental, through-the-skin punctures while working in patients' mouths within the previous year and ten within the past five years.

Yet even with the 21 percent rate of probable hepatitis B acquisition from their patients, only the one dentist mentioned above became positive for HIV in this study. Further studies of oral to oral and oral to genital sexual contact are difficult to evaluate because of the usual presence of other forms of sexual contact that are high risk behaviors. However, several studies have found that kissing and insertive oral-genital contact are not independent risk factors for HIV infection.

Finally, of sixteen known persons bitten by HIV-positive subjects who had been studied up to the end of 1989, none had become infected with HIV. And of a total of 113 health care workers in the hospital setting who were exposed to the saliva of HIV-positive subjects, *none* became positive himself. Many of the workers had open wounds or actual injections of saliva beneath the skin.

Of 76 health care workers who worked with the urine of HIV-infected persons none had acquired HIV. Also, there is no evidence that HIV-infected babies transmit

7. The studies from which I have distilled this information include: A. Berthier *et al.*, "Transmissibility of Human Immunodeficiency Virus in Hemophilic and Non-Hemophilic Children Living in a Private School in France," *The Lancet,* 13 September 1986; Margaret A. Fischi *et al*, "Evaluation of Heterosexual Partners, Children, and Household Contacts of Adults With AIDS," *Journal of the American Medical Association,* 6 February 1987; Janine M. Jason *et al.*, "HTLV–III/LAV Antibody and Immune Status of Household Contacts and Sexual Partners of Persons with Hemophilia," *Journal of the American Medical Association,* 10 January 1986; Gunnel Biberfeld *et al.*, "Transmission of HIV Infection to Heterosexual Partners but Not to Household Contacts of Seropositive Hemophiliacs," 18 *Scandinavian Journal of Infectious Diseases,* 497–500; Doreen B. Brettler *et al.*, "Human Immunodeficiency Virus Isolation Studies and Antibody Testing," *Archives of Internal Medicine,* June 1988; Alan R. Lifson, "Do Alternate Modes for Transmission of Human Immunodeficiency Virus Exist?" *Journal of the American Medical Association,* 4 March 1988; Gerald H. Friedland and Robert S. Klein, "Transmission of the Human Immunodeficiency Virus," *New England Journal of Medicine,* 19 October 1987; Robert S. Klein *et al.*, "Low Occupational Risk of Human Immunodeficiency Virus Infection Among Dental Professionals," *New England Journal of Medicine,* 14 January 1988; W. Robert Lange *et al.*, "Are Missionaries at Risk for AIDS? Evaluation for HIV Antibodies in 3,207 Protestant Missionaries," *Southern Medical Journal,* September 1989.

HIV virus to other children or adults who have close contact with them. In this setting the contact materials would include primarily urine and feces, but also saliva to some extent. Yet in no case has there been evidence of transmission to other children or adults even from the preschool age or from neurologically handicapped children who require intensive care that involves close physical contact with urine and feces. As with saliva and tears, the risk of HIV transmission from urine, while theoretically possible, is clinically unsubstantiated.

Finally, studies of American protestant missionaries in Africa, where HIV-like infections may have been endemic since the late 1950's, demonstrate that missionary staff and their families were not at high risk of HIV infection between 1967 and 1984, even when serving in regions of high HIV endemicity. These findings, which support the conclusion that HIV is not transmitted by insects, is born out by the American experience. Five- to fifteen-year-old children constitute 16 percent of our population and have the greatest exposure to insects; however, as of January 1987, subjects in this age group accounted for only 0.2 percent of all AIDS cases. After removing the 98 percent of these AIDS cases that are known to have established risk factors, we are left with at most a .004 percent incidence of AIDS in this age group for which we cannot directly account. Data from indigenous African populations confirm low incidence of the disease in children.

## VI.

However, it is one thing to conclude that, in the absence of a freak accident resulting in an unintentional exchange of blood, it is nearly impossible to contract HIV by casual contact, and quite another to determine the legal dimensions of the obligation of "reasonable accommodation" in the face of widespread fears. This, then, brings us to an inquiry concerning what law is all about. As Plato pointed out in *The Laws*, law is not just a set of mechanistic, pragmatic rules; rather, law is a process of instructing society in a moral and ethical vision. Therefore, in this case we should do two things: First, we should unequivocally articulate the scientific, public health and moral case for non-discrimination against HIV-positive subjects; and second, we should also be compassionate and understanding concerning the fears of the general public about possible life-threatening infection from a freak accident, casual contact, or that $10^{-5}$ to $10^{-6}$ probability that we don't entirely understand the etiology of the disease.[8]

If there were ever an appropriate place for the conciliation and mediation services of the Human Rights Commission, it is in employment discrimination cases involving HIV-positive subjects. This is because: (1) understanding the mechanism of AIDS transmission is difficult; (2) many of the public health considerations implicated in AIDS are counter-intuitive; and, (3) AIDS has become such a contentious political issue that employers and the public are likely to believe that the government (including the courts) are lying to them. Therefore, I believe that it is important to outline here some of the practical considerations that should instruct the commission's decisions about what is a "reasonable accommodation." Indeed, when we are talking about a phenomenon as frightening as AIDS, two factors must be taken into account: First, the employer's own attitude about HIV-positive subjects; and second, the employer's other employees' and customers' attitudes about HIV-positive subjects, both of which are beyond the employer's control.

It is one thing to require the telephone company to hire HIV-positive telephone operators and bookkeepers, and quite another to require a Holiday Inn or local fast food restaurant to hire HIV-positive food handlers. As irrational as it might be scientifically, widespread rumor that a restau-

---

8. Although most evidence seems to exclude infection by casual contact, there are still HIV-positive subjects whose infections *may* have come otherwise than from known risk factors. Because determining known risk factors such as homosexuality, prostitution, and IV drug use depends upon a patient history, there is always a problem of patient veracity. *See,* Kenneth G. Casto *et al.,* "Investigations of AIDS patients With No Previously Identified Risk Factors," *Journal of the American Medical Association,* 4 March 1988, p. 1338.

rant hires cooks with AIDS would have disastrous consequences for business, and because the public's fear is beyond the employer's control, it is difficult to envisage an available "reasonable accommodation."

Finally, it should be obvious that employees who demonstrate progressive clinical illness or symptomatic immunological deficiency are not "otherwise qualified" for continued employment.[9] This result has potentially shocking implications for our system of health insurance: If an employee is involuntarily separated from employment because of clinical AIDS, does he or she then lose health insurance protection? I would think that as a matter of public policy the answer should be "no," and group health policies should contemplate this eventuality. But that is an issue to be addressed by the legislature and the insurance commissioner. In light of the demands that will be made on our national health care system in the coming years to care for AIDS patients, however, all group health policies .should contemplate the roughly three to five million undiagnosed HIV-positive subjects currently in the general population and provide for continued health insurance upon involuntary separation from employment. This, in turn, will remove the incentive to stretch or manipulate, from considerations of compassion, the legal definition of "otherwise qualified" (i.e. "bona fide occupational qualification," *W.Va.Code*, 5–11–9 [1987]) to include those who are really too sick to work, but who need continued health insurance.

Indeed, it is difficult adequately to distill from the dry, clinical literature the degree of suffering that symptomatic AIDS patients endure. Physically, they develop multiple, unusual infections that require treatment for the rest of their lives. In many cases, the treatment itself is highly toxic, adding to their suffering even more. They become emaciated, and some develop the lesions and physical disfigurement of Kaposi's sarcoma. Dementia can occur,

and the frustrations of being unable to think and speak clearly can become overwhelming. Finally, and what is most to the point in this case, the emotional pain is equally intense. In some cases the patients are disowned by their families at a time when they need help the most. They lose their jobs along with their insurance and are left destitute, helpless in the face of the stigma of the disease and treated everywhere as lepers.

Yet the ostracism that even symptomatic HIV-positive subjects face is entirely unnecessary, and the misery associated with such ostracism is *needless* suffering. At the heart of this conclusion is the fact, discussed *supra*, that for every diagnosed HIV-positive subject, there are (according to the mathematical models) at least sixteen undiagnosed cases.[10] If, then, we are already in day-to-day contact with HIV-positive subjects whose condition is unknown to us, does it not make sense to continue day-to-day contact with the HIV-positive subjects whom we know and to whom we already have ties of friendship and affection? The answer to that question is obviously "yes," and it is that logic which instructs my understanding of what the law on this matter should be.

---

**9.** *See Army Regulation* 600–110, *supra* note 3, at 4–12(a).

**10.** Although at the moment there have been only 124 patients with AIDS in West Virginia, of whom 62 percent have died, nonetheless in the

big cities persons come in contact with the infected regularly. Communication from Michael B. Edmond, M.D., W.Va. University Health Services Center.